# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. White*, 2011 IL 109689

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. KENYATTA WHITE, Appellant. |
| Docket No. | 109689 |
| Filed | August 4, 2011 |
| Rehearing denied | September 26, 2011 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an appeal from a criminal conviction, a reviewing court may review a forfeited issue under the closely-balanced-evidence prong of plain-error review only where the evidence is so closely balanced that the alleged error alone would tip the scales of justice against the defendant or there was a reasonable probability of a different result had the evidence in question been excluded. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Diane G. Cannon, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Richard M. Goldwasser, of Schoenberg, Finkel, Newman & Rosenberg, LLC, of Chicago, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Veronica Calderon-Malavia and Michelle Katz, Assistant State's Attorneys, of counsel), for the People. |
| Justices | JUSTICE KARMEIER delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Thomas, Garman, and Theis concurred in the judgment and opinion. |
| | Justice Burke dissented, with opinion, joined by Justice Freeman. |

**OPINION**

¶ 1    Following a bench trial in the circuit court of Cook County, defendant, Kenyatta White, was convicted of first degree murder for the shooting death of Aramein Brown. Defendant was subsequently sentenced to 55 years' imprisonment. Defendant appealed, arguing, *inter alia*, that he was denied his sixth amendment right to counsel where the police barred his attorney from observing witnesses when they identified the defendant in a lineup. Defendant had not raised that argument in the circuit court. After its review of the record the appellate court found, as a threshold matter, that the evidence was closely balanced; thus, the appellate court proceeded to examine the issue via the closely-balanced-evidence prong of plain-error analysis. Ultimately, the appellate court affirmed, finding, first, that a total prohibition of defense counsel from observing the moment of identification was a violation of the accused's sixth amendment right to effective assistance of counsel, but concluding thereafter that defendant's sixth amendment right to counsel had not attached at the time the lineup was conducted. 395 Ill. App. 3d 797.

¶ 2    Defendant filed a petition for leave to appeal to this court, arguing that (1) the appellate court erred when it held that defendant's sixth amendment right to counsel had not attached "even though defendant had been formally charged, his arraignment had been prompted and restrictions had been imposed on his liberty"; and (2) the appellate court erred when it ruled that defendant's sixth amendment right to counsel had not attached "at the time he *ought* to have been presented in court for his initial appearance."

¶ 3    We granted leave to appeal pursuant to Supreme Court Rule 315(a) (Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010)). Having now thoroughly examined the record, and having considered all bases for relief pursuant to plain-error review, we affirm the judgment of the appellate court insofar as it upheld defendant's conviction; however, we find that the appellate court's pronouncements on the substantive issues are *dicta*, as the facts of this case do not bring it

-2-

within the purview of plain-error review: the evidence was *not* closely balanced–contrary to defendant's argument and the appellate court's finding. We note that a determination as to whether evidence is closely balanced is not strictly a quantitative assessment. No argument was made that the alleged error was of such a magnitude that it would have affected the fairness of defendant's bench trial and challenged the integrity of the judicial process. In order to demonstrate the error in the appellate court's assessment, and the relative insignificance of the claimed sixth amendment violation in the outcome of defendant's bench trial, we will set forth an extensive recitation of the evidence, testimony, and arguments presented below.

¶ 4                                    BACKGROUND

¶ 5        Aramein Brown was shot and killed at approximately 10:30 p.m. on January 6, 2003, at a gas station located at 79th and Yates in Chicago. Preliminary investigation of the matter led to the filing of a "Complaint for Preliminary Examination" on February 20, 2003, in which "complainant," Detective Alejandro Almazan, stated that defendant had committed the murder. On the basis of those allegations, an arrest warrant was issued setting bond at $1 million.

¶ 6        Defendant was arrested that same day–February 20, 2003–in East St. Louis, Illinois, and was held in the St. Clair County jail until he was transported back to Chicago on February 25, 2003. On the following day, February 26, 2003, defendant was placed in a lineup. Defendant's attorney was present with defendant in the room where the lineup participants were displayed, but counsel was not present in the adjoining room where and when the witnesses viewed the individuals in the lineup.

¶ 7        Grand jury proceedings were conducted on February 27, 2003. Martina Brewer testified that she and her boyfriend, Aramein Brown, were at a gas station on January 6, 2003, at approximately 10:30 p.m. Aramein was at the gas pump talking to two other individuals on the other side of the pump–one of whom was his cousin–when someone came from behind the van in which she was seated and shot Aramein several times. Brewer testified that Aramein tried to run, and more shots were fired. She said she knew the shooter by the name of "Yatta."[1] After Yatta shot Aramein, Yatta ran away. Brewer said she began to chase him, but soon turned around and went back to where Aramein was lying on the ground. Then she called the police. Assistant State's Attorney Nicholas Pappas showed her People's Exhibit No. 1, which she identified as a photo of Yatta, the person she saw shoot Aramein that night.

¶ 8        Keith Slaughter also testified before the grand jury. On January 6, 2003, between 10 and 10:30 p.m., Slaughter was driving down 79th westbound toward Yates. While stopped at a red light, he heard a gunshot, and then noticed two individuals at a nearby gas station: "One had just seemed as though he just fell over, just hit the ground. And another individual was standing there also. He had just started *** running off." The person he saw ran off about 10 feet after the shooting, "then he doubled back to the individual" and "shot him four to six

_____

[1]This nickname later appears in the record as "Yada." The same person is referenced in both instances.

-3-

more times." Thereafter, the shooter "casually trotted off" southbound on Yates and jumped into a vehicle. Slaughter was shown People's Exhibit No. 1, the photo of Kenyatta White, and he remarked, "It looks to be the person who was the shooter." The assistant State's Attorney asked:

> "Q. The person you just testified to?
>
> A. Yes.
>
> Q. The one you indicated started to run away and then came back and fired several times, four or five times, at the victim?
>
> A. Correct.
>
> Q. The same one that ran down Yates?
>
> A. Exactly."

¶ 9 Slaughter affirmed that he never saw the person falling in possession of a weapon, nor did the victim make any threatening gesture toward the shooter. Slaughter testified that the man he identified in People's Exhibit No. 1 got in a car after the shooting and drove off. When he later looked back at the victim, he saw a female "hovered over him on the ground." Slaughter acknowledged that on February 13, 2003, he was shown a series of photographs and he identified the person in People's Exhibit No. 1 as the shooter. Further, Slaughter confirmed that he was present for a lineup on February 26, 2003, at which he identified the same individual he had recognized in the photo. Slaughter was then asked:

> "Q. Okay. At any time on February 19th or February 26th, did anyone force you, threaten you, or coerce you to identify the individual here in People's Exhibit No. 1?
>
> A. No.
>
> Q. And how about on February 26th, did anyone force you, threaten you, or coerce you to make that identification?
>
> A. No."

With respect to conditions at the crime scene, Slaughter noted that the lights were "very bright."

¶ 10 The day after grand jury proceedings were concluded, a second "Complaint for Preliminary Examination" was filed on February 28, 2003, with Detective John Fassl as the listed complainant. That same day, defendant made his initial court appearance.

¶ 11 Based on the grand jury testimony, an indictment was filed on April 2, 2003, charging defendant with six counts of first degree murder for the shooting death of Aramein Brown.

¶ 12 On December 5, 2005, a bond hearing was conducted for material witness Martina Brewer. At that hearing, the State alleged that Brewer had made "numerous statements" that she had no intention of coming to court to testify in this matter. Bond was set at $25,000 to ensure her appearance at defendant's trial. Her attorney stated: "I don't know what kind of case this is because I was just appointed a few minutes ago but she is I guess in fear for her safety." Brewer, speaking to the judge, then confirmed: "Ma'am, please, I swear I'm afraid. You can ask them. They know." Brewer's appointed counsel suggested that the State should "try to help her as opposed to putting her in the Cook County Jail."

¶ 13 Assistant State's Attorney Brian Sexton responded: "Judge, we've offered this witness witness relocation. She is afraid and that's just like a lot of other witnesses out there and she's already indicated she's not coming to court because she's afraid."

¶ 14 Appointed counsel opined: "Judge, they're willing to risk her safety in the Cook County Jail to get her appearance for trial." Brewer, obviously distraught, pleaded: "Can you all please help me? I swear I'm going to come to court ***. I just don't want to go in there because I'm afraid ***. They know where my mother live. That's why she moved."

¶ 15 Judge Diane Gordon Cannon, the judge who would preside at defendant's bench trial, stated: "We will see you on January 24th, Ma'am."

¶ 16 Defendant's bench trial commenced on January 24, 2006. The State called Martina Brewer as its first witness.

¶ 17 Brewer testified that the victim, Aramein Brown, was her boyfriend in January of 2003. She identified defendant in open court, stating that she knew him by the nickname "Yatta." Brewer testified that she and Aramein were in Chicago on January 6, 2003, and at one point, around 10 p.m., they went to a gas station at 79th and Yates to get gas and buy marijuana from Brown's cousin. Aramein was standing outside talking to his cousin when Brewer heard a loud sound like a firecracker. She said she looked up and "the guy" was running away. Aramein was running, holding the back of his head, then he fell to the ground and did not move thereafter. Brewer stated that she got a gun out of her vehicle and ran after the man, then came back. The other two men present–Aramein's cousin and the other unidentified individual–drove off. She said they came back later and she gave them Aramein's gun.

¶ 18 Brewer then testified that Aramein's brother, Ajani, showed up. According to Brewer, he asked her if she knew who killed Aramein. Brewer claimed she told him she did not. Continuing, Brewer testified as follows: "So he said, you know what, let me talk to you before anybody else comes." She claimed that Aramein's brother, Ajani, walked away a short distance with her and told her to say that Yatta "did this killing." She continued: "I don't know what his reason was for telling me that, but my boyfriend had just got murdered, anything sound like a good idea at this point. If you know what I don't know, then fine, I'm gonna roll with you." At that point in her testimony Brewer insisted she did not know who killed Aramein Brown.

¶ 19 Upon further questioning by the State, Brewer acknowledged her testimony before the grand jury wherein she identified defendant as the shooter. She denied telling Detective Almazan at the hospital, after the shooting, that Yatta had shot Aramein. She acknowledged that, when she was later at the police station, she told the detectives she knew "the offender" and his name was Yatta. Brewer denied telling the police that Ajani Brown and Yatta used to be friends, stating: "No sir, because I don't know Ajani Brown." In questioning immediately thereafter, Brewer contradicted herself, acknowledging that she *did* know Ajani Brown, and that he and Yatta *had been* friends. Brewer confirmed that the police had shown her a photo array at the police station and she had identified defendant as the offender. She testified she "probably" had identified defendant's photo before the grand jury as well. Immediately after *that* testimony, Brewer stated, "I don't even remember them showing me pictures."

¶ 20    Asked if she was afraid to identify defendant as the shooter, she responded she was not. The prosecutor then recalled the statements Brewer had made in open court during her bond proceeding on December 5, 2005, when she indicated she was afraid to testify.

¶ 21    As Brewer acknowledged her prior statements, and started to explain why she was afraid, the court halted proceedings and admonished Brewer: "If you're testifying that you lied before the Cook County Grand Jury, ma'am, that's perjury." The court advised Brewer that she needed to consult with an attorney, the court appointed an attorney for that purpose, and took a short recess to allow for consultation.

¶ 22    When trial resumed, the prosecutor asked Brewer who shot Aramein Brown. Brewer refused to answer. When the court directed Brewer to answer, Brewer responded: "Okay. I don't know." The prosecutor then resumed questioning Brewer about the fear she had expressed at her December 2005 bond hearing. In response, Brewer suggested that she was afraid of Aramein's brother. The prosecutor then asked: "So what you're telling us is that you were afraid of the Browns and not Kenyatta White, is that what you're telling us?" Brewer responded: "I mean, I was afraid of both."

¶ 23    Brewer confirmed she had initially given the police an account of the shooting. When the prosecutor questioned her about specific details of that account, and asked whether the Brown family had told her to say those things, Brewer repeatedly answered, "I don't remember," or she replied in the negative. Brewer denied telling the authorities that she was afraid to testify against defendant because she had heard there was going to be a hit on her child if she testified against him. However, she acknowledged that she had indicated she was afraid to testify against him. Further, she admitted, on the day of her bond hearing, making the following statement to the prosecutors when they were trying to secure her testimony: "What if I told you someone else did it?" She admitted she had been approached by someone who told her the offender could not have been Kenyatta White because he would have had a hard time running due to a bad leg. When asked to identify that person, Brewer refused to do so. When the court directed her to answer, she stated she did not know the man's name. Brewer denied that she had told law enforcement officials, on December 5, 2005, that Kenyatta was the shooter, and that she had later learned defendant mistook Aramein for Ajani Brown, who was the intended target.

¶ 24    Under cross-examination, Brewer reiterated her testimony on direct that defendant was not the shooter. She testified she did not tell the dispatcher she knew who killed Aramein. She said she could not recall telling any uniformed police officer at the scene of the shooting that she knew the shooter. Brewer said: "I may have told them that he had on dark clothes, but that's all I knew." She said the offender did not seem to be struggling when he ran away. Brewer then testified to the statement of recantation she provided to defendant's counsel.

¶ 25    On redirect, the prosecutor inquired as to the circumstances giving rise to Brewer's recantation:

> "Q. How was it that you found out who represented Kenyatta White?
>
> A. I went down there to his office, my brother took me to his office.
>
> Q. How did he find out?
>
> A. I don't know. I was in New Orleans. I just got a call.

Q. You came all the way from New Orleans up here?

A. Yes, sir.

Q. Because you wanted to set the record straight, is that correct?

A. Yes, I did, because I was tired of living the way I was living. I knew I was lying about this guy and I know that Aramein's brother told me that if I didn't say this that he was going to harm my daughter, so–

Q. Let me ask you this question, when did the fear of the Browns end?

A. When I moved away. I didn't have to see them any more, so, you know.

Q. So when you were here back on December 5th, who were you afraid of when you were saying you were afraid?

A. I was afraid of Aramein's family and Kenyatta.

Q. Oh, but you weren't afraid enough to sign that recant, is that right?

A. Because I knew I was telling the truth."

¶ 26 On recross, Brewer testified that she got a call from her brother while she was in New Orleans: "He said you know do you want to come down here and tell them what really happened? And I said, yeah, why not, you know, because I'm tired walking around with this on my back." Brewer said she did not call the State's Attorney's office because her lawyer told her she did not have to talk to them.

¶ 27 The court then questioned Brewer, inquiring as to the circumstances of her abrupt return to Chicago from New Orleans in order to make a statement recanting her prior sworn testimony. Referring to Brewer's brother, the court asked:

"Q. He called you in New Orleans out of the blue and says do you want to come out here?

A. He called me the other day. I had just left from up here. And I was, you know, telling him what happened. So he was like, you know, do you want to come and tell this guy's lawyer what happened for real. And I'm like yeah, you know, because I'm tired with walking around with this on my back, I'm tired of lying about this whole situation, I just want it to be over with and that's what happened.

I came down here, I will [*sic*] talked to the lawyer, I told him everything that I knew about the whole thing and I went back home.

Q. So you were here, didn't talk to any lawyers, went back to New Orleans, get a call from your brother, come right back?

A. Yes, ma'am. And that's what happened.

Q. Why didn't you talk to the lawyers when you were here?

A. Because they didn't know–I didn't know anything about the lawyers when I was here. And I was upset because I had just gotten home. So when I got home, and that's when he called me, like man I need you to come back out here, you know.

Q. So your brother told you he needed you to come up?

A. Yeah, he needed me to come back out here i[f] I wanted to get this thing

straight. I'm like, of course I want to get it straight.

> Q. Where is your brother now?

> A. I'm not sure.

> Q. What state does he live in?

> A. He lives in Chicago."

¶ 28    The court then inquired as to why Brewer did not call the State's Attorney's office and advise them of her recantation:

> "Q. You said you didn't call the State's Attorney's office because your lawyer told you that you didn't have to talk to them.

> A. Lawyers. I had just got, you know, what you call it, legal advice. It wasn't my lawyer. But I was asking, you know, what am I–am I supposed to tell these people that I went and talked to his lawyer or what am I supposed to do. And the lady that I talked to, she told me that it's not necessary for me to tell them.

> Q. What lady was this?

> A. I'm not sure of her name, it was just–I had called her, my mom gave me a number to call a lawyer, so I said fine I'll call her and get legal advice. So she said I didn't have to tell them everything I was doing, every move that I was making, she said that I didn't have to tell them.

> Q. You don't know this woman's name?

> A. No, I'm not sure of her name, ma'am."

¶ 29    For its next witness, the State called Nick Pappas, an attorney who, on February 27, 2003, was employed by the Cook County State's Attorney's office. Pappas testified he spoke with Martina Brewer on that date, when she appeared as a witness before the grand jury. He identified grand jury transcripts to which the defense stipulated. Brewer told him, and the grand jury, that she knew the shooter by the name of Yatta. She never indicated that she had been threatened by Ajani Brown to name Kenyatta White as the murderer. Pappas specifically asked her if anyone had threatened or coerced her and she said no one had. She identified defendant as the offender by his photograph.

¶ 30    The State next called Sherry Collier to testify. Collier stated she was new to the neighborhood where the shooting occurred, having lived there only "two to three days" at the time of the murder. She resided there with her grandson, who was then five years old. On January 6, 2003, at approximately 10:30 p.m., she was at the gas station located at 79th and Yates using a pay phone, as she had not yet gotten phone service in her home. At that time, she saw a van at the gas pumps and noticed a person coming toward her down 79th Street. Eventually, the man came to stand right next to her and her grandson. He was a mere five feet away, and he made her uncomfortable because she felt he was too close to her grandson. She got a good look at him. She testified that he had "a distinct face." Collier identified defendant in open court as the man she saw that night.

¶ 31    Collier testified that defendant was looking toward the pumps. He then pulled out a black gun and started walking, then trotting, toward the pumps. When he reached the pumps, he shot at a man standing by the van. After the first shot, the man at the pump started to run.

Both men ran toward Yates. The victim then fell, defendant shot him again, and defendant then took off "full speed" southbound on Yates.

¶ 32    Collier said she was scared and she took her grandson across the street to a grocery store. She testified she was there for "30, maybe 40 minutes" watching out the window. The police arrived in less than 10 minutes. Asked what she was thinking at the time, Collier responded: "Actually, I was thinking, you know, my son had just got killed two years before this, and I was debating on did I want to go over and say what I saw or should I just go home." Collier decided to say something. She walked back across the street with her grandson and looked for "the nicest policeman" she could find.

¶ 33    She eventually spoke to a uniformed police officer and offered a general description of the man she saw. She said he wore black pants, a black hoodie, a leather jacket, and a skullcap. The man pulled the hoodie back when he started to shoot. Collier confirmed she had given an estimate of the man's height and weight. Asked if she had noticed anything unusual about the man's hair, Collier stated that the man had black hair, "dreads, a lot of hair," but it was underneath his skullcap.

¶ 34    Collier stated she had never seen defendant before that night. She testified she did not know anyone by the name of "Johnny Brown or Sundyatta Brown."[2] She had never heard of the victim in this case, Aramein Brown. She had "never heard of an individual that went by the nickname 'Yatta'."

¶ 35    Collier testified that the police showed her a series of photos at the police station on January 13, 2003. The prosecutor asked if she had picked anyone out in those pictures. She indicated she had, stating: "That guy right there." The record indicates that Collier was pointing to defendant. Collier was then asked if she viewed a lineup on February 26, 2003, and if she had identified anyone in that lineup. She stated that she had: "That guy right there in the green suit." Again, the record indicates that Collier was pointing to defendant. Collier was shown People's Exhibit No. 7, the photo array she viewed, from which she identified the defendant as the shooter. She was then shown People's Exhibit No. 8, a photo of the lineup in which defendant was a participant. Collier put a mark above defendant's image in that photograph, indicating that he was the person she identified. She affirmed in neither instance did the police indicate who she should pick.

¶ 36    Collier confirmed that the State's Attorney's office had paid various expenses to relocate her. At the time of trial, she was no longer living in the home she occupied on January 6, 2003.

¶ 37    Under cross-examination, Collier insisted that she got a good look at defendant as she was facing his direction while talking on the phone. "I got the best look when he was standing next to my grandson." She said she had turned to ask defendant to move back some when defendant produced the gun. At that point he was focused on the people at the pump. She agreed with defense counsel's suggestion that defendant has a distinctive face, and she acknowledged she had not mentioned that to the police. Collier testified she looked through

---

[2]"Johnny Brown" appears to be a reference to Ajani Brown. The name "Sundyatta Brown" later appears in the record as "Sundiata" Brown.

a lot of photographs when she made her initial identification of defendant. In the lineup she later viewed only one man who had a lot of hair, and that was defendant.

¶ 38    On redirect, the prosecutor asked Collier if she had identified defendant in the lineup only by his hair. Collier answered in the negative, explaining, "Because he has the same face." The prosecutor then asked: "What is so unusual about the person's–that person's face?" Collier responded: "It's long. It's–it's ugly." Upon further questioning, the prosecutor established that Collier had picked defendant's photo out of the photo array even though he did not have long hair in the photo.

¶ 39    On recross, defense counsel again elicited Collier's acknowledgment that she had told neither the officers at the scene nor the detectives that the offender had a long, ugly, or distinctive face. She maintained, however, that she did tell the detectives that night she could identify the shooter.

¶ 40    The State next called Shawn Davis. On January 6, 2003, Davis was living at 7938 Yates. He testified he was going out his front door around 10:30 p.m. that evening when he heard three gunshots coming from the direction of the gas station. He later looked in that direction and saw a man running to a car at the pace of a "jogging sprint." The man got into the passenger side of a burgundy or red Dodge Stratus, which then sped away up the street. Davis testified that he got a look at the man's face, noting, the "street light is right there in front of my house." Davis identified defendant in open court as the man he saw that night. Davis testified he does not know anyone by the name of Ajani Brown, Aramein Brown, Sundyatta Brown, or Sherry Collier.

¶ 41    Davis said he and his sister went up to the gas station the night of the shooting and saw the victim on the ground. Davis then spoke to a uniformed officer at the scene. He stated, when he observed defendant the night of the shooting, defendant was dressed in dark colors, wearing a hoodie and a skullcap. He had noticeable facial hair and hair sticking out of the hoodie. The prosecutor asked: "Is there anything unique that you noticed about this defendant?" Davis responded: "His jaw line. *** It's very distinct. It's very like a chiseled jaw line." On the night of the shooting, the officer did not ask him about the jaw line; Davis just gave a general description and indicated he could identify the man he saw running from the gas station. Davis said defendant did not appear to have difficulty running on the night of the shooting.

¶ 42    Davis testified he told detectives later that night that he could identify the man he had seen. They came to his house on January 29, 2003, and showed him a series of photographs. From that photo array, he picked "[t]he man sitting right there," pointing again to the defendant in open court.

¶ 43    Under cross-examination, Davis acknowledged that he had seen defendant "growing up in the neighborhood," stating, "I have seen him on 79th Street, never knew who he was." Davis estimated, in his lifetime, he might have seen defendant four or five times in passing on the street.

¶ 44    The State next called Mart Brewer–Martina Brewer's brother–to testify. Mart Brewer confirmed that Aramein Brown was Martina's boyfriend in January of 2003. Mart stated he did not know defendant or the Brown family that well. Brewer testified he was at a

McDonald's on 53rd Street in Hyde Park when he "overheard" someone "saying that, that I guess [defendant's] lawyer needed to talk to my sister, so she can get the truth out." Brewer said he felt threatened insofar as they were talking about his sister in his presence. He felt that his sister was being threatened, and he was concerned for the safety of his sister, her child, and his mother. Thereafter, he called his sister in New Orleans. When she returned from New Orleans, he picked her up at the airport and took her downtown. She got out of the vehicle, and he picked her up 30 minutes later.

¶ 45 Brewer testified that Martina never told him that Ajani Brown had threatened her. She never said she had made up something against defendant because she was afraid of the Browns. He acknowledged he did not want to come and testify in this case.

¶ 46 When the defense declined an opportunity to question the witness, the court conducted its own examination. In the course of that examination Brewer explained, after he overheard the conversation in the McDonald's, he called his sister and told her she needed to come back to Chicago. The court then inquired:

"Q. How did you know where to drive once she got back?

A. I don't remember. That was like four years ago.

* * *

Q. Did they say, by the way, when she comes in, she should head down to LaSalle?

A. I know it wasn't nothing like that, but I don't remember.

Q. How did you get the address to take your sister from the airport?

A. Ma'am, I don't remember. Like that was so long ago.

Q. Did she tell you where to go?

A. I don't remember, ma'am. I don't remember. It was so long ago, ma'am. I really don't remember.

Q. Well, how many lawyers' offices, how many times have you overheard conversations about your family, family members, prompting you to call another state, tell them to come in, and drive them downtown? Has that ever happened before?

A. No.

Q. How did you know where to go?

A. Ma'am, I really don't remember. It was so long ago.

Q. Did you have an address written down?

A. No, I didn't have an address written down.

Q. How would you have known where to go in the downtown area with your sister who just flew in from New Orleans? How could you have known that?

A. Ma'am, I really don't remember. It was so long ago."

With that, the court apparently recognized the futility of further questioning and the witness was excused.

-11-

¶ 47    The next witness to testify was Gustavo Martinez, an investigator for the State's Attorney's office. Martinez testified that he served a subpoena on Martina Brewer on December 5, 2005. He took Martinez initially to the Lansing police department, and then to the courthouse at 26th and California. Outside the courtroom, two assistant State's Attorneys spoke with her. Martinez and his partner were also present.

¶ 48    During that conversation, Brewer related that she was afraid to testify because she had heard through her child's father that there was going to be a hit on her if she testified against the defendant. She also stated she saw what she saw, she knows defendant, and she identified defendant via photograph for the police. At one point she asked, "What if I told you someone else did it?" When asked why she would say that, Brewer indicated someone had approached her and told her the offender could not have been defendant because he had a hard time running due to a bad leg. Brewer was then asked whether defendant shot Aramein Brown, and she responded affirmatively, acknowledging that defendant had a distinctive face. She stated she had heard defendant really wanted to kill Ajani Brown, but mistook Aramein for Ajani. Martinez reported that Brewer cried several times during the course of the conversation.

¶ 49    Under cross-examination, Martinez acknowledged that Brewer was not under oath at the time she spoke, she was not represented by an attorney, and she was, at the time, facing an imminent bond hearing.

¶ 50    Following Martinez's testimony, a stipulation was entered of record concerning statements she made in the course of the bond hearing, specifically, that she said she was afraid to testify in this, defendant's, case, because "they" knew where her mother lived.

¶ 51    Next, Officer Ken Francisco was called and testified that he was working the evening of January 6, 2003, when, around 10:30 p.m., he was dispatched to the scene of a shooting. He was only a block and a half away when he received the call. Upon his arrival at the scene, he observed a young lady standing next to a person on the ground. There was a pool of blood around the victim's head. Officer Francisco described the woman as "somewhat hysterical." He later learned that woman was Martina Brewer. Francisco testified he was able to get a "brief description" of the offender from Brewer, but she was not very detailed. She did not at any point tell him that Kenyatta did it. Another witness came up to him while he and his partner were discussing processing of the crime scene. That witness was Sherry Collier. Collier, who had a young boy with her, related a basic summary of what happened and provided a description of the offender. She described the shooter as a black male, 20 to 30 years of age, approximately 5 feet, 10 inches tall, between 160 and 190 pounds, wearing dark clothing and a black hat. Specifically, she said he wore a three-quarter length jacket, a black sweatshirt, and black pants. Francisco did not ask her if the man had unique facial characteristics. Shawn Davis also approached Francisco and described the person he saw running from the scene as wearing all black, similar to Collier's clothing description. Davis added the general observation that the man had a lot of hair.

¶ 52    Under cross-examination, Francisco stated he was on the scene within minutes of the shooting. Brewer never told him she knew who the shooter was, nor did she mention distinctive features. She *did* say he was dressed in dark clothing. Collier never mentioned

distinctive facial features, or that the offender was wearing a hoodie, or that he had lots of hair. No one indicated that the offender had difficulty running or trotting.

¶ 53     On redirect, Francisco reiterated that Collier did mention a dark sweatshirt. Moreover, Francisco noted that his conversations with the witnesses only lasted a minute or two.

¶ 54     Detective Brandon Deenihan testified that he was assigned to investigate the homicide. Working with Detective Almazan, they first went to South Shore Hospital, where they spoke with Martina Brewer. They later interviewed Brewer in an interview room at Area 2 Detective Division between 1 and 2 a.m. on January 7. At that time, she had already told Detective Almazan who the offender was. Brewer stated she and Aramein were at the gas station to buy marijuana. She described what she did after shots were fired, a recounting of events that was consistent with her grand jury testimony. Brewer never indicated that she was afraid of Ajani Brown or that he had threatened her. Deenihan showed her a photo array and she picked out defendant's photograph. Deenihan also spoke with Sherry Collier and Shawn Davis at their homes. Both stated they would be able to identify the person they saw.

¶ 55     Deenihan said he was unsuccessful in his attempts to locate the victim's cousin, David Jennings. Deenihan received a phone call from defendant the evening of January 8. Deenihan told defendant he was interested in speaking with him, and defendant said he would come to Area 2 Detective Division on January 13; however, defendant never showed up. Assuming defendant's presence, arrangements were made to bring in several witnesses, including Martina Brewer and Sherry Collier, for a possible lineup on January 13. When defendant did not appear, Deenihan showed Collier a photo array, from which she identified defendant as the shooter. Shawn Davis also identified defendant from a photo array.

¶ 56     Under cross-examination, Deenihan was asked how he created an unbiased photo array, and he explained how the computer-generated photo array was produced. He stated he inputted the person he was looking for and the computer then generated other subjects with similar characteristics to be included in the array. Defendant's photo came from the Chicago police department database warehouse; in that photo defendant had short hair. Because defendant had short hair in his mug shot, all the other individuals generated by the computer also had short hair.

¶ 57     Deenihan acknowledged that Collier did not say anything about the offender's hair, a hoodie, or distinctive facial features. She described the gun as a black automatic. She stated defendant ran south on Yates after the shooting. Davis was the first one to mention a hoodie. He said the offender had facial hair, but he said nothing about hair on the offender's head or distinctive facial features. According to Deenihan, Davis stated he made his observations from his front door. He did not indicate he had seen the man before.

¶ 58     Detective Alejandro Almazan was also assigned to investigate the January 6, 2003, homicide of Aramein Brown. Almazan testified he first spoke with Martina Brewer at South Shore Hospital, where she told him she knew the shooter by the name of "Yatta" or "Kenyatta." After that conversation he arranged for her to be taken to Area 2 headquarters.

¶ 59     Detective John Fassl testified that he was contacted by the U.S. Marshall's Service on February 18, 2003, and informed of the whereabouts of Kenyatta White. Two days later, on February 20, a warrant was issued for defendant's arrest. Defendant was detained in East St.

Louis, Illinois, and was then brought to the St. Clair County jail, where he was held until he was transported back to Chicago on February 25, 2003.

¶ 60    Fassl then contacted witnesses for a lineup. Fassl testified he was present when Sherry Collier viewed a lineup on February 26. Defendant and four other individuals participated in the lineup. Attorney Johnson, who was representing defendant, was in the room with defendant. Fassl entered a separated room with Collier where she viewed the lineup through one-way glass. She identified defendant as the person she saw shoot Aramein Brown. Fassl testified she identified defendant immediately upon viewing the lineup.

¶ 61    The following colloquy took place in the course of attorney Johnson's cross-examination:

"Q. [W]hen I came and I wanted to be present for the lineup, you placed me in the same room with those five fellows here in Exhibit No. 8, only you can't see me, right?

A. Yes sir. ***

* * *

Q. So Room No. 4 is where you put me, the attorney, right?

A. Yes, sir.

Q. And that was your decision to put me in that room?

A. Well, that's procedure, sir. You would go, you are entitled to be with your client.

Q. Well, so is it Chicago police policy that if an attorney comes to be present for a lineup, that he is to be placed into the same room with the people to be observed?

* * *

A. The policy is if you wish to be present for a lineup, it's to be in the room with your client *** not with the people viewing the lineup.

Q. And that's the way in other lineups that you have conducted which you have had attorneys present, you put them in the room with the people being viewed and not the viewer?

A. Yes, sir.

Q. And then, basically, you are present with the person viewing, so you are the person that could then come to court and testify, if needed, as to what this person's reaction was, correct?

A. Yes, sir.

Q. You are the person–that can come here and say the person was positive, or hesitant, or that didn't make an identification, is that correct?

A. Yes, sir.

Q. The attorney is in the room where he can't observe the witness making these observations, correct?

A. That's correct, yes, sir.

Q. So the attorney has no way of knowing what this witness may or may not be

saying, correct?"

An objection to relevance was made and overruled.

"Q. And that's the policy of the Chicago Police Department?

A. Yes, sir."

¶ 62    Fassl acknowledged that defendant was the only one in the lineup with dreadlocks, and that two of the participants were in their twenties, while defendant was in his forties.

¶ 63    On redirect, it was established that two other participants were 43 and 47 years of age. Speaking to the composition of the lineup, Fassl explained: "We use people from the lockup from the 5th District, so we try to get as close physical age, height, et cetera, and that's the best that we could do at the time.'

¶ 64    On recross, attorney Johnson asked: "Detective, could you find anybody else with the distinctive facial features of Mr. White to put in that lineup?" Fassl stated he could not.

¶ 65    After various stipulations were entered of record regarding pending exhibits and forensic findings, the State rested. Defense counsel made a motion for directed verdict. In the course of his argument in support of that motion, counsel addressed his decision not to challenge the identifications made by Brewer and Collier via photo array and lineup:

"Your Honor, there's no motion pending, nor have we filed a motion regarding suppression of this photo array or lineup. And the reason being, your Honor, is I don't know how the police department could create a fair lineup with Mr. White. I don't know how they could do it.

When the court as the trier of facts looks over and looks at Mr. White, there's one thing that is obvious; and, that is, Mr. White's facial features. We can't get by that. We can't get around that.

When Mr. White walks into a courtroom, that's where all of our eyes are, his features. And for that reason, Judge, I know it was different [*sic*], probably impossible to create a lineup finding other people that looked like Mr. White.

For that reason, Judge, the fact that individuals stood out and Ms. Collier chose that picture is no surprise. It's not that she saw Mr. White, but Mr. White stood out."

Defense counsel went on to use defendant's distinctive features in support of an argument that witnesses who did not mention defendant's distinctive features could not have seen him commit the murder.

¶ 66    The State countered that the witnesses were not asked if defendant's facial features were distinctive; they told the police they could identify the offender, and they did: "These witnesses have nothing to gain to testify against this defendant. This defendant does have a distinctive face, that's how they were able to identify him, Judge."

¶ 67    In denying defendant's motion for directed verdict, the trial court first spoke to Martina Brewer's recantation:

"Months after her boyfriend who she had lived with for three years is killed in front of her, she says I didn't see anything. Cries and says don't make me testify. Somehow, a conversation is overheard in a McDonald's and lo and behold she lands

-15-

in a lawyer's office and no one knows how this came about. The recantation is suspect.

*** I have weighed her testimony under [section] 115, and I find her grand jury testimony, her statements to the police immediately following it, her identification of the defendant in a photo array to the police to be credible."

¶ 68 The court then referenced the corroborative impact of Sherry Collier's testimony:

"Supporting her testimony is a grandmother who somehow found the strength to walk back across the street after having witnessed this shooting and speak to the police, and she was as sure as she can be when she identified defendant in open court.

She said she would never forget his face. And Mr. White, it's a blessing, it's a curse to have a distinctive face. You can look at it both ways. She recognized your face. She identified you with hair and without hair. She is sure she would not forget your face. Her testimony was credible. She was unimpeached. She has no motive to lie, to pick out a man she has never seen before in her life. She had only lived in that neighborhood three days at the time of her–the shooting and when she made the identification to the police."

¶ 69 As for Shawn Davis' testimony, the court noted, "[H]e came in again after hearing shots fired, he corroborates the path that the defendant took following the shooting ***." The court concluded that the State had met its burden of proof.

¶ 70 The first witness called by the defense was Samantha Davis, Shawn Davis' sister. Like her brother, she too testified that she was in her residence at 7938 South Yates Boulevard when, around 10 or 10:30 p.m., she heard gunshots coming from the gas station on the corner of 79th and Yates. Davis disputed her brother's testimony concerning their positions in the house when they heard shots fired, insisting that *she* was initially at the front door and he was at the window. Moreover, she testified that the Dodge Stratus–or Chrysler Sebring–that the running man entered was *green* rather than red or burgundy. However, she agreed that the man was dressed entirely in black. Although she saw only a side view of the man, she did not notice any unusual facial features. She testified she was sure defendant was not the man she saw that night. She stated she was not able to identify anyone in the photos police showed her, and she told the State's Attorney's office she would not be able to come to court because she had to take care of her mother.

¶ 71 Under cross-examination, Davis denied telling the police that the man she saw entered a *burgundy* Dodge Stratus. She admitted telling the detectives that she would not be able to identify anyone. The prosecutor then asked:

"Q. So how do you know it's not him if you can't identify anybody?

A. Because the man I saw was tall.

Q. So you're just basing it on tall?

A. No, I'm not basing it on height. He had just a regular sculptured round face."

Davis claimed she told the detectives the man she saw had a "round structured face." Davis acknowledged that there is a street light right in front of her house and the man she saw was running in her direction. The prosecutor then asked about her perception of her brother's

experience as a witness:

"Q. Now did you have an opportunity to talk to your brother yesterday after he testified?

A. I spoke with him briefly.

Q. And in fact, what if anything–where did you talk to him?

A. At our residence.

Q. And what if anything did he tell you?

A. As I just said, somebody was after him. Get in the house. And that was it.

Q. And did he tell you–did he appear scared?

A. Yes.

Q. You still live in that neighborhood don't you?

A. Yes.

Q. He does not? He doesn't live at 7938 South Yates?

A. Yes.

Q. Your mother still lives at 7938 South Yates?

A. Yes.

Q. You were concerned about your brother when he said, get in the house? Didn't he say, hurry, get in the house they're after me?

A. Yes.

Q. You were concerned weren't you?

A. Not really because I didn't know what was going on. I had, like, arrived at my residence.

* * *

Q. You knew he was a witness in this case didn't you?

A. I knew he was a witness, but I didn't know what dates he had to come to court.

Q. Well, when he said, hurry get in the house, they're after me, you were concerned for him, right?

A. Right, I asked him what he was talking about. He never did say. I went about my business.

Q. Well, you were concerned yourself as well, weren't you?

A. Yes.

Q. And you're still concerned, aren't you?

A. Yes.

Q. Because you still live there?

A. Yes."

¶ 72    Davis testified she was driven to court by attorney Johnson's associate. The prosecutor then asked: "And, in fact, Mr. Johnson out in the hallway before you testified, he showed you

-17-

Mr. Kenyatta White, he was standing about two feet from you wasn't he?" Davis responded affirmatively. The prosecutor inquired: "How did that make you feel?" Davis denied that she was bothered by the confrontation, stating: "He's just a person." However, she again conceded she was concerned for her safety and that of her brother.

¶ 73    On redirect, Davis denied that she had been threatened in order to secure her testimony; she maintained she was testifying truthfully.

¶ 74    The next witness to testify in defendant's behalf was Annie Mae Handy. Handy testified that defendant would sometimes "just show up" at her residence to visit, and he did so on the evening of January 6, 2003. Handy stated that defendant arrived at her residence around 7 or 8 p.m. She said he ate with her and her daughters, Tonya and Anastasia, and he watched television with them. Handy testified that she went to bed after the 10 p.m. news, and Anastasia left at that time. Handy said she later awoke to find defendant and Tonya playing cards. Around 11 or 11:15 p.m., she told him it was time to leave. Handy stated she had known defendant for approximately seven years, and he is unable to run.

¶ 75    Under cross-examination, Handy testified that defendant called and talked to her and her daughters the day after the shooting. She said, "I don't know what he said to them, but they told me that–he said he had been accused of killing somebody." She recalled an investigator from the State's Attorney's office coming to talk to her "quite a few times." She described her interaction with him as follows:

> "[H]e showed his credentials. And I asked him if I had committed any crime, and he said no. I said, 'well, I don't want to talk to you,' and I closed the door."

Handy said the investigator asked about defendant, and she did not answer any of his questions.

¶ 76    Inquiring about her relationship with defendant, the prosecutor asked:

> "Q. So he comes over and he plays cards, right? Does that happen a lot?
>
> A. No.
>
> Q. How often did it happen?
>
> A. It happened that night. I don't allow gambling in my house."

Handy estimated that defendant showed up "once every three weeks, maybe a month." She could not give any other dates when he was there. Handy said she spoke to defendant three days after his visit. They talked about him being at her house at that particular time, he told her he was being sought in connection with a murder, then he started teasing her about her ex-husband. The prosecutor inquired:

> "Q. And did you ever take this information that you had and *** go to the authorities or the police or someone and say oh, this guy couldn't have done it because he was with me?
>
> A. Well, I felt like if his lawyer–I should have been telling that to his lawyer.
>
> Q. Oh, so the answer is no, you didn't do that, right?
>
> A. I didn't do that.

* * *

Q. [W]hen Kenyatta White talked to you on the telephone and asked you to be a witness.

A. Okay.

Q. He told you what date he was supposed to be at your house, right?

A. Right.

* * *

Q. But he never told you, oh, it would be like at 10:30 at night that I need you to say I was there?

A. Oh, no.

Q. Never said that?

A. Never said that.

Q. But did you see him during that day?

A. No.

Q. So for all you know, that crime could have occurred at 10:00 o'clock in the morning, right?

A. I don't know.

Q. Well, no, that's true isn't it? It could be at 1:00 o'clock in the morning, right?

A. I guess it could have been, I don't know.

Q. But you still told him oh, I'll be a witness, right?

A. Right, I did."

Handy said the last time she had seen defendant was the day before she testified, when she was at his lawyer's office, being prepared for what her testimony would be.

¶ 77    On redirect, Handy maintained that she is a religious woman and would not vouch for defendant if in fact he had not been at her house.

¶ 78    Defendant next called Tonya Evans, Annie Handy's daughter. Evans testified that she lived with her mother, and did so in January of 2003. Evans said she had known defendant for six or seven years. He was a friend of her father's. Evans testified that defendant came to their house, by himself, on January 6, 2003, around 8 or 8:15 in the evening. She said he ate with them and watched television. Evans stated that her mother went to bed when the news ended, and she and defendant then played cards for money. Between half an hour to 45 minutes later, her mother came back and asked defendant to leave.

¶ 79    Under cross-examination, Evans said her sister, Anastasia Smith, was also present that night and left before the news at 10 p.m. Evans initially resisted the prosecutor's attempt to characterize defendant as a friend of hers, but she eventually conceded that he was. She was unsure of other dates defendant might have been to their home prior to January 6, 2003. She testified that date stuck out in her mind: "Because he used my toilet upstairs, broke my toilet. We laughed about that, and I told him to get the plunger and get to work." Levity aside, Evans testified that she also remembered that particular night because it was her first day back at work after having given birth to her son. The prosecutor later asked:

"Q. So he told you about the murder?

A. No, he stated that they said he had committed a murder the day before. And I explained to him that, how could he have committed a murder when he was here with us?

Q. Did he also tell you that they said he committed a murder at a certain time?

A. No, he did not. We didn't discuss the time.

Q. Well, if you didn't know the time, how is it that you knew you were a witness and he couldn't have done it?

A. Because he was over at our house that night.

Q. Oh, he said night?

A. Yes he did."

¶ 80    Evans acknowledged that she had seen defendant four or five times between his arrest and her testimony. She stated she and her mother had spoken about what happened. Although she knew the police were looking for defendant in connection with a murder, she testified, initially, that she did not tell them or the State's Attorney's office that defendant was in her house when the murder occurred. Under continued questioning, she claimed to have told a sergeant "maybe after the tenth visit"; however, she could not remember his name.

¶ 81    On redirect, Evans testified that defendant's attorney never told her what to say. She confirmed she had asked attorney Johnson whether or not she was obligated to go to the State's Attorney or the police and he told her she was not.

¶ 82    The next witness to testify was Akim Akbar, the man who specified the location for the drug transaction during which Aramein Brown was killed. Akbar testified that he knew David Jennings and also knew members of the Brown family. He said he knew defendant, though they were not friends. Akbar testified that he and Jennings went to the Amoco on 79th Street on January 6, 2003, to sell marijuana to Aramein Brown. According to Akbar, no one other than the three of them knew about the meeting. When Akbar and Jennings arrived, Brown was already there and Martina Brewer was with him. Akbar said he got out of the vehicle to give Brown the marijuana and then went inside the station to get cigars. Akbar testified, as he was returning to his van, a man came from the rear of his van and started shooting at Brown. Akbar said the shooter had a brown skullcap and a beige outfit. He testified he had never seen the man before, and that man was not in the courtroom.

¶ 83    Akbar testified, after the shooting, he and Jennings drove away a couple of blocks, and then Jennings told him to go back. According to Akbar, he refused and got out. He said Jennings then took the van back to the scene. Akbar later learned that Aramein Brown had been killed. Akbar never went to the authorities or told anyone that he had seen the shooting. Akbar testified that defendant was not the shooter. Akbar denied that he was threatened or paid to testify, and he asserted his testimony was truthful.

¶ 84    On cross-examination, the prosecutor asked Akbar how he picked that particular gas station as the site for the drug transaction. Akbar stated it was not far from his neighborhood. He denied he was a gang member, and claimed he knew defendant's name, "[j]ust through neighborhood conversations, overhearing it." He was aware there was some animosity

between defendant and the Browns at the time of the shooting. Akbar admitted that the gas station, the site of the drug transaction, was well-lit. The prosecutor then asked:

"Q. But for some reason you had to get out in this lighted station and give him the stuff outside there, is that right?

A. Yes, sir.

Q. Anything that prevented him from just coming inside that van where you could give it to him?"

Akbar responded that Jennings was on the passenger side. The prosecutor continued to question Akbar about the conspicuously public exchange of drugs in a well-lit area:

"Q. So there's nothing that would prevent [Aramein] from just going up to the driver's side and saying here and you giving him *** the marijuana, correct?

A. Naw.

Q. Pardon me?

A. Not that I know of.

Q. No. But you say you had to get out, right?

A. Yes, I got out."

¶ 85    Akbar testified he never went to the police to let them know the shooter was someone else, even though he was aware the police were looking for defendant. He admitted he had been convicted of unlawful use of a firearm by a felon, had gone to the penitentiary, and had been released less than 10 years from the date of his testimony. He stated he did not know a woman by the name of Sherry Collier or a man named Shawn Davis. He claimed he had not told anyone what his testimony would be before he took the stand.

¶ 86    On redirect, Akbar acknowledged he had spoken with attorney Johnson about a week prior to his testimony, and at that time related the account of events to which he testified at trial.

¶ 87    The defendant's next witness was Keith Slaughter, the man who had provided identification evidence during grand jury proceedings. Slaughter testified that, on January 6, 2003, he was a passenger in a vehicle driven by Brian Williams. They were coming to a stop at a stoplight at the corner of 79th and Yates when Slaughter heard gunshots. Slaughter said he looked over at the gas station and noticed one individual who seemed to have just fallen, and another person who was either past him or appeared to be running away from him. That person then went back and shot the man on the ground about four more times.

¶ 88    Slaughter testified that the shooter was wearing beige clothing and a matching skullcap. He did not recall a hoodie. Slaughter stated the man ran, apparently without difficulty, from the gas station toward a parked car. He said the car looked "like a station wagon," perhaps a Taurus. Slaughter testified he did not get a good look at the man's face. He said he and Williams chased the car, but they were unable to get a license number. They eventually called 911, and he told the police what he saw.

¶ 89    Slaughter then testified to a February 10, 2003, phone conversation with the police wherein he claimed to have told them he would not be able to make an identification. He said

they came to his home on February 19 and showed him some photos. Referring to the photo array that bore indicia of his identification, Slaughter testified he told them: "I couldn't make out the person on this as far as the shooter. I didn't see the shooter, but before I finished looking at the pictures I said the person and the resemblance of this one person my name is next to." Slaughter stated, after he said that, the detectives said, "that's the person." Slaughter testified he never confirmed that was the person; he never said he was sure.

¶ 90 About a week later, he was summoned to the police station to view a lineup. Referring to a photo of that lineup, which again bore his mark, indicating an identification of defendant, Slaughter claimed to have said at the moment of identification: "I believe I said that's the person right there that I saw in the picture." Slaughter stated he never indicated that defendant looked like the shooter.

¶ 91 Under cross-examination, Slaughter conceded that his vehicle was stopped about a third of a block from the gas station, a "nice distance," and that the scene of the shooting was illuminated with yellow lights. He recalled talking to detectives on February 19 and at that time describing the perpetrator's clothing as light to medium brown. Slaughter admitted it was possible that the shooter was wearing a hoodie and it was down. He stated the man he saw ran down Yates toward a red car. Slaughter then testified that he could not say whether defendant was the shooter or not, conceding he could be. He acknowledged that the police never told him whose photograph he should pick, and that his signature appeared by defendant's photo. Slaughter could not recall an assistant State's Attorney coming to his house later and showing him the same photo array. He could not recall telling the assistant State's Attorney the person in the photograph he identified was the person he saw shooting on January 6, 2003. He admitted he might have said that, he just could not recall.

¶ 92 Slaughter testified when he viewed the lineup he had not spoken with any other witnesses. The witnesses were kept separate. He does not know Sherry Collier and he did not talk to her before the lineup. The detectives did not tell him whom to pick. He admitted he picked defendant's photo.

¶ 93 Slaughter recalled testifying in front of the grand jury on February 27, 2003, around the same time as the lineup. When he was confronted with his grand jury testimony, Slaughter recalled saying that the shooter "casually trotted off" south on Yates after the shooting and jumped into a vehicle. He recalled testifying before the grand jury that the person he identified in People's Exhibit No. 1, the photo array, "looks to be the person who was the shooter." Upon further reflection, he did not think he told the grand jury that the person he identified in the photo array was someone who merely "resembled" the shooter. Slaughter acknowledged that he testified under oath before the grand jury.

¶ 94 On redirect, Slaughter maintained that the shooter's clothing still appeared to be beige as he ran away from the lights of the gas station. Despite his grand jury testimony, he insisted he never positively identified defendant as the shooter.

¶ 95 The defense next called Detective John Fassl. Fassl was first questioned about the processes by which defendant was identified as the perpetrator. Fassl testified, prior to February of 2003, he had conducted approximately 50 lineups. Prior to the February 26, 2003, lineup in this case, defendant had been identified via photo array. A week before the

lineup was conducted, Fassl and his partner, Almazan, had gone to Slaughter's house with a photo array. They asked Slaughter if he could identify anyone in the photo array and, without hesitation, Slaughter picked defendant's photograph, stating, "that was the man who he saw–who did the shooting at 79th and Yates, that was the offender." He made a positive and unequivocal identification. Slaughter did not remark on any unusual facial features. He said the man he saw was wearing a matching brown outfit and got into a red Ford Taurus station wagon. Later, at the lineup, Fassl was alone with Slaughter in the viewing room. Fassl explained that lineups are conducted with the subjects individually approaching the viewing glass. When defendant, who was the third subject, approached the glass, Slaughter said something to the effect of "that's him." He did not say that was the guy from the photograph. Fassl noted that Sherry Collier also made a positive identification of defendant at the lineup.

¶ 96    On cross-examination, Fassl explained, when he talked to Slaughter on February 19, he asked Slaughter whether he could identify the shooter and showed him the photo array; that is when Slaughter chose defendant's picture. In that photo, defendant had short hair. Fassl did not ask Slaughter to describe any unusual facial features.

¶ 97    With respect to the lineup, Fassl stated that attorney Johnson was in the room with his client. Johnson never objected to the lineup. At the lineup, Slaughter never said he was identifying defendant because he saw him in the photograph.

¶ 98    On redirect, attorney Johnson asked: "Now detective, if I had said to you that evening, no, stop the presses, no lineup–." At that point the State objected on the basis of speculation, and the objection was sustained. Defense counsel's questioning then returned to the matter of his placement during the lineup procedure–a matter which counsel *chose* not to challenge pre-trial, after the State's case-in-chief, at the close of all the evidence, or post-trial, but upon which defense counsel nonetheless questioned Fassl during both the State's case and his own. Redirect examination proceeded, in part, as follows:

"Q. Detective, where was I placed at the lineup?

A. You were in Room Number 4 with your client and the other participants in the lineup.

Q. I was in that room, but did I ask to be in that room?

A. I can't recall. I believe you asked to be present, and as I stated when I testified last week, that procedurally if you want to be present for the lineup you would stand with your client and not in the room with the witnesses.

Q. Was I in a position to know who the witnesses were at that point?

A. No, sir.

Q. You didn't allow me to see the witnesses, did you?

A. No, sir."

¶ 99    In the course of questioning, Fassl confirmed that counsel was not in a position to know who the witnesses were at that point, as counsel was not allowed to see them, and counsel did not know what the witnesses said until after the fact, when Fassl told counsel that his client had been positively identified by both witnesses. Fassl stated it was his understanding that defense attorneys are placed in a room apart from the witnesses to avoid intimidation of

witnesses. Fassl acknowledged, under the circumstances, he was the only one who could testify what the witnesses said when they viewed defendant.

¶ 100    After Fassl's testimony, defendant took the stand. He stated he was 44 years old and he was a promoter for Burning Spear Entertainment. He attributed his "distinctive look" to a condition called acromegaly, a growth hormone defect that causes protruding growth. In addition to that condition, he said he also suffered from a deteriorating bone disease and severe arthritis. He claimed he could not run, and he displayed his legs for the court. Defendant said he did not have the ability to run down the street and jump into a car.

¶ 101    Defendant acknowledged that he knew the Browns and he confirmed, at some point "years ago," there was a "falling out" with them. Defendant then suggested the reason for the "falling out" was his discovery, in the "last part of 2002, the early part of '03" that Ajani Brown was wearing a wire for the government. Defendant stated that his nephew, Antwon White, was killed in November of 2002, and "Sandiata" Brown was arrested. After acknowledging the acrimonious relationship he had with the Browns, defendant testified that he had nothing to do with the shooting of Aramein Brown.

¶ 102    Defendant testified, in the evening of January 6, 2003, when the shooting took place, he was at the home of Anna Mae Handy. Defendant said he was a friend of Handy's ex-husband, Odell Smith, who then lived in East St. Louis, Illinois. Defendant stated he went alone to Handy's residence on January 6, 2003, arriving around 8 or 8:15 p.m. He said, when he arrived, persons present were: Tonya Evans[3] and her son, her sister, Anastasia Smith, and her mother, Anna Mae Handy. Defendant testified they watched television that night until Anna Mae went to bed. Then he and Tonya played cards until around 11 or 11:15 p.m. when Anna Mae told him to leave. Defendant said he then drove home to Park Forest, a 25-minute drive, stopping on the way at a gas station at 69th and Ashland.

¶ 103    Defendant said he learned about the shooting the next morning when he got a call from an individual named Ricky Green. He testified he then called around to see if it was true and ascertained that the shooting took place in the evening. He said he next called Tonya and Anna Mae and "said that I might need them as alibi witnesses depending on the time." Defendant testified he later learned the time the shooting took place. He stated he did not ask Evans or Handy to lie for him. Subsequently, defendant learned the police were seeking him for questioning. Defendant acknowledged he did not go to the police, offering this explanation:

> "[T]hey had repped the street that the police were saying it was me, and once I learned that I knew then that something was wrong. *** I was hoping at some point that the truth would come out and there wouldn't be no need for me."

¶ 104    Instead, defendant went to East St. Louis with Anastasia Smith, stating that he "went down to see Odell Smith." He was arrested there on February 25, 2003. He was subsequently transported back to Area 2 headquarters, and was ultimately charged in Aramein Brown's murder. Defendant posted bond, but was arrested on December 29, 2003, for an incident

---

[3]In the transcript of defendant's testimony, Evans is identified as "Tanya" instead of "Tonya," as earlier in the record. We will refer to her here as "Tonya."

involving Ajani Brown. Defendant explained: "Ajani Brown had got shot 15 times if I'm not mistaken." Defendant said the case against him was later dismissed. Defendant stated he was also arrested upon leaving the courthouse on July 7, 2004. The accusation was that he had shot Gregory Floyd. Defendant said those charges were dismissed when he provided the police with proof that he was in Los Angeles when the crime occurred.

¶ 105    On cross-examination, the prosecutor established that defendant knew the police were looking for him, that he had agreed to come in, that he had a lawyer at the time, yet defendant never showed up. The prosecutor then asked why. The following colloquy ensued:

"A. Because I was hoping for the truth.

Q. What do you mean?

A. Well, there are no two people that I know of that look like me, so when you talk about mistaken identity, I know that's almost impossible.

* * *

Q. So you didn't want to come in in case you were identified in a lineup, did you?

A. No, sir, that wasn't the case.

Q. So why didn't you come in?

A. Because I was hoping that the truth would come out and there would be no need for me to.

Q. So you didn't want to help the police out at all, did you?

A. If I could have, I would have.

Q. Right. You wanted to get away from the police?

A. No, sir.

Q. Well, you didn't try to clear your name, did you?

A. No, sir.

Q. You knew the police were looking for you?

A. Yes, sir.

Q. So you did the exact opposite, you left the jurisdiction, didn't you?

A. No, sir.

Q. Well, you were in East St. Louis, weren't you?

A. Sometime after that, yes.

Q. In February of '03?

A. Yes, sir.

Q. And this whole time you knew that the police were looking for you, didn't you?

A. Yes, sir.

Q. In fact, they were knocking on Anna Mae's house a lot of times, weren't they?

A. Yes, sir.

Q. And you probably heard from them that the police were looking for you, didn't

you?

A. Yes, sir.

Q. And you never showed up and volunteered to surrender yourself to the cops, did you?

A. No, sir.

* * *

Q. And instead of surrendering yourself to the police you decided to go to East St. Louis?

A. Yes, sir."

¶ 106　　Defendant acknowledged that he went by the nickname "Yada," that he does not know Sherry Collier, that he has never seen her with the Browns, and that he does not know Shawn Davis. However, he claimed he *had* seen Shawn Davis with the Browns. Asked when, defendant responded: "I think it had to be the ending part of 2002." Asked where, defendant said it was at Ajani Brown's mother's house. The prosecutor then asked:

"Q. Why would you be at Ajani Brown's house if you already had a personal grudge against him in–I believe you said in September of '02 or late '02?

A. Just about the ending of '02.

Q. So why would you be over [at] the Browns' house if you had a beef with him?

A. We hadn't actually fell out then.

Q. Oh, so it's before the beef?

A. Yes, sir.

* * *

Q. So how do you know it was Mr. Davis?

A. I remember his face when he was sitting there.

Q. And that just occurred to you, huh?

A. Yes, sir.

* * *

Q. So that's the first time you ever seen him was in Mr. Brown's house?

A. Yes, sir.

Q. Again, what was the exact date that you were over at the Brown's house?

A. I don't recall.

Q. Give us a ball park figure.

A. I would say it was in the summertime, maybe about July, June or July."

¶ 107　　The prosecutor then turned his attention to the nature and extent of defendant's physical disability, noting at the outset:

"Q. Well, you walked here fine today to get to court every single day, correct?

A. Yes, sir. I did.

Q. And back in January of '03 you didn't have a cane did you?

-26-

A. It depends because it varies.

Q. So you had a cane now, is that your testimony?

A. No, no, I'm saying I don't remember. I'm saying sometimes I have a cane, sometimes I don't. Well actually, crutches.

Q. You didn't have a cane with you today, did you?

A. No, sir, I didn't.

Q. And you said this condition gets worse, correct?

A. It varies, it fluctuates.

Q. So this whole time you've been coming to court, have you had a cane once?

A. No, sir, I haven't.

Q. So back in January of '03 you could walk fine, couldn't you?

A. I don't remember."

¶ 108    The prosecutor then returned to defendant's disagreement with Ajani Brown, asking:

"Q. You had a disagreement with Ajani Brown in late '02, 2002?

A. Yes, sir, I would say.

Q. Because you had heard that he was dangerous?

A. Yes, sir.

Q. He was wearing a wire against you, that's what you were worried about, weren't you?

A. No, sir.

Q. Well, why would you think he was dangerous then?

A. Well, because if somebody is looking for him and I'm with him, I don't think they're going to distinguish. If they hurt him, I'm going to get hurt."

Defendant claimed it did not even occur to him that Brown might be wearing a wire against him. He said he was not mad at Ajani Brown, and he had never said or done anything to him, so he was at a loss to explain why Brown would "put a case on him."

¶ 109    Questioned as to his relationship with Anastasia Smith, defendant described it as a "cordial" relationship. He acknowledged that they went to East St. Louis together, but he denied that he stayed in a motel room with her–or that the police had to chase him when he was arrested. He admitted that Anastasia Smith posted $50,000 bond to secure his release on March 1, 2003, and that she was listed on the bond receipt as "best friend." However, he claimed–notwithstanding the bond slip's recitation that it was her money–that the money actually came from Raymond Washington. The prosecutor asked defendant if Anastasia still stayed at 6357 South Laflin (Handy's residence), and defendant responded he did not know. Asked when he last saw her, defendant answered the day prior to his testimony.

¶ 110    On redirect, defendant insisted he had seen Shawn Davis before, but he had not seen him since the summer of 2002, when he was at the Browns' house.

¶ 111    After defendant's testimony, it was agreed that the State would begin presenting rebuttal witnesses even though defendant still had one witness to call in his case. The first rebuttal

witness to be called by the State was Robert Prawiec.

¶ 112    Prawiec testified that he worked as an investigator for the Cook County State's Attorney's office and, on October 13, 2005, he and Gus Martinez went to 6357 South Laflin to interview Anna Mae Handy, Tonya Evans, and Anastasia Smith. He said, on that date, they attempted to ask Tonya Evans about Kenyatta White and she replied she did not want to talk to them until she spoke to defendant's attorney. They returned to that address on October 17, 2005, and spoke to Anna Mae Handy, who said she did not know anything about the case and did not do anything wrong.

¶ 113    Nick D'Angelo, an assistant State's Attorney, testified that he met with Detective Fassl on February 19, 2003, at approximately 9 p.m., and interviewed Keith Slaughter. Fassl brought a photo array that Slaughter had already seen. They showed the photo array to Slaughter and he identified the photo of Kenyatta White. He made a positive identification of White as the shooter. As a result, D'Angelo approved an arrest warrant for the defendant. D'Angelo said Slaughter never indicated that defendant only resembled the person he saw shooting: "[H]e told me it was a positive identification of the shooter."

¶ 114    Under cross-examination, D'Angelo said of Slaughter: "He told me that the picture that he picked out in the photo array, the same photo array I showed him, was the person that he saw shoot the victim at the gas station." Present at that time with D'Angelo were Fassl and Almazan. D'Angelo observed that the photo array had previously been marked and signed by Slaughter. D'Angelo explained: "I wasn't there, but that's one of the reasons that I went to his house, to interview him myself." D'Angelo acknowledged that Slaughter had said the shooter was wearing all brown clothing and a brown hat, and he did not mention unusual facial characteristics or hair, but D'Angelo noted: "I didn't ask him either." D'Angelo said Slaughter stated the man he saw got into a red Ford Taurus station wagon after he had walked down Yates after the shooting. D'Angelo stated that Slaughter said the man "started to walk and then maybe he said ran to the car, but I think he said walking down Yates."

¶ 115    The State next called Sergeant Brandon Deenihan. Deenihan testified that he interviewed Samantha Davis at her house on January 7, 2003, at approximately 8:30 p.m. During that interview, she did not at any time tell him that the offender had entered a green car; she said it was a burgundy Dodge Stratus. She never gave a physical description of the man she saw, and she stated she could not identify him. She said she observed a black male running south.

¶ 116    Officer Ken Francisco was called by the State to testify that there were four witnesses initially in the investigation: Sherry Collier, Shawn Davis, Samantha Davis, and Martina Brewer. Francisco said the police were looking for a maroon car at the outset of the investigation.

¶ 117    The defense then called its final witness, Brian Williams. Williams testified that he knows Keith Slaughter–they were childhood friends–and he was with him in the evening of January 6, 2003. Williams said he was driving his car westbound on 79th, with Slaughter as his passenger. They were stopped at a red light at the corner of 79th and Yates when they heard gunshots. Williams said he saw a man running from behind a gas station at that location and then realized the shots had come from that direction. Williams testified he saw one man run from behind the gas station and fall, then another came from behind the station

with a gun. Williams stated that man was wearing a brown matching outfit and hat. Williams confirmed the color could be described as beige. The man was wearing a skullcap; he did not notice a hoodie. Williams said he saw the man's face. The man with the gun ran south to a burgundy automobile, jumped in, and the auto took off.

¶ 118    Williams followed the car for a while, but eventually stopped and returned to the gas station. Slaughter had by then called the police. However, Williams did not talk to the police. He said around a month later, he spoke to a DEA agent, and he believed he gave that person a description of the clothing the perpetrator was wearing. Williams said no law enforcement officer ever asked him to view photographs. Williams acknowledged he had told his friend, Keith Slaughter, that he did not want to look at any lineups or photographs.

¶ 119    Williams said a little more than a week prior to his testimony–about three years after the shooting–he had a conversation with a private investigator who was working for defense counsel. The investigator asked him to look at some photos. Williams met the man at a Borders book store at 53rd and Lake Park Avenue. He viewed those photos–apparently photos of defendant–and told the investigator: "This wasn't the man I saw do the shooting." Williams stated, in open court, defendant was not the man he saw the night of the shooting. Williams said he did not know defendant.

¶ 120    Under cross-examination, Williams admitted he could not give any description of the female he saw in the vicinity of the shooting. He acknowledged the investigator showed him a photo of only one individual three years after the incident. The prosecutor then asked:

"Q. And these photos that you were shown here with the–on the profile here, you're not telling us that the man that you saw stopped so you could study his profile, are you?

A. No. The man I saw, I think I told the detective when I found out that the gentleman got locked up for the crime, I saw another guy on 79th Street, I would testify he did the shooting more than he did.

Q. What detective was that?

A. Whoever the guy was that contacted me last week.

Q. The guy that contacted me last week?

A. Yes, the investigator.

Q. When you say detective, what was your understanding of who that person was.

A. He told me he was representing–he said something. I don't know.

Q. Pardon me?

A. I forgot what he told me, who he was.

Q. Well, did he say he was a detective?

A. No.

Q. He didn't say?

A. Yes, yes, he did. He said detective.

Q. And what did you understand that to mean? Who did he work for?

A. I really didn't care.

Q. You didn't care?

A. No.

Q. You didn't want Keith Slaughter to tell where you lived, is that a correct statement?

A. Yes."

¶ 121 The prosecutor then questioned Williams about his decision not to step forward and provide information earlier in the investigation of the case:

"Q. Now, when you went over–when this was done with and you went over by the gas station, you never got out of the car and talked to the police over there, is that correct?

A. Correct.

* * *

Q. Why is that?

A. Because I *** felt my job was done. I chased the car, tried to get the license plates. The lady who was there, she saw the guy. The police was there doing their job. I figured it was an open-and-shut case.

Q. Okay. So didn't bother to tell them, hey, I can identify this person, I know what he looks like, right?

A. No."

Further questioning revealed that the person who contacted Williams to testify in this case was given Williams' new cell phone number by Keith Slaughter. However, Williams maintained he had not recently discussed the case with Slaughter. The prosecutor asked:

"Q. No mention of this at all?

A. No.

Q. He didn't mention to you he was going to be testifying?

A. No.

Q. And you never realized that he was a witness in this case is what you're telling us?

A. At the beginning he told me he had to go down there to look at some mug shots.

Q. Did you say to him I'll come and look at mug shots with you?

A. No.

Q. Why was that?

A. I told him I wasn't going.

Q. Why, sir?

A. I felt I did my job already.

* * *

Q. You didn't want to be a witness in this case at all, am I correct about that?

-30-

A. You're correct.

Q. Stand to reason you didn't want to be because you were afraid to be a witness in this case as well, is that correct?

A. No.

Q. No?

A. No.

Q. You just thought your job was done by following this car?

A. Yes."

¶ 122 Asked about the street lighting near the scene of the shooting, as depicted in People's Exhibit No. 4, Williams agreed that it looked yellow in color.

¶ 123 On redirect, defense counsel asked Williams if he thought the lighting made the offender's outfit appear beige. Williams responded: "It was in the brown family, I wouldn't say beige. Beige is too light. It was more rust." He acknowledged that the outfit did not change colors when the man was running down the street. Upon questioning by defense counsel, Williams recalled the investigator/detective telling him that he was working in conjunction with defendant's attorney. Williams said, when the investigator showed him the photos, he was sure the man depicted therein was not the man he saw that night.

¶ 124 After stipulations of minimal significance, the parties made their closing arguments to the court. Thereafter, the trial judge rendered her decision.

¶ 125 In announcing its finding of guilt, the court noted, at the outset, its previous findings of credibility with respect to the State's witnesses when the court denied defendant's motion for directed verdict. The court then addressed the credibility of defendant's alibi witnesses, Anna Mae Handy and Tonya Evans, and defendant's relationship with Handy's other daughter, Anastasia Smith. The court clearly questioned the credibility of Handy and Evans, citing, *inter alia*, their lack of forthrightness during the three years between the shooting and their trial testimony, and an overall minimization on the part of the defense as to the true nature of the relationship between defendant and Anastasia. The court rejected attorney Johnson's repeated attempts to bolster their credibility by portraying them as "God-fearing witnesses."

¶ 126 The court also offered negative commentary on the circumstances of Martina Brewer's recantation, observing, with respect to her initial reports, that she "did name the defendant as the shooter on the night of the incident and did know defendant."

¶ 127 As for Keith Slaughter's attempt at trial to essentially retract, or recharacterize, his prior identification of the defendant, the court observed: "He said [the photograph he identified] resembled the shooter, and if one side has said it, both sides have said it, Mr. White is not somebody that you would confuse with someone else."

¶ 128 In the end, the trial court made these comments, which seem to appropriately summarize–while understating–the underlying dynamics one discerns in this case, even by reading the cold record:

"It goes without saying that witnesses are reluctant to come into a court of law in any case, especially a charge of first-degree murder. The Court has examined the

-31-

possibilities for the reluctance of some of the witnesses and the testimony of the witnesses and any possible motives, bias or interests they may have."

The court concluded, based on the credibility of the witnesses, and the reasonableness of their testimony, that defendant was proven guilty beyond a reasonable doubt.

¶ 129                                         ANALYSIS

¶ 130    In defendant's petition for leave to appeal, and in his opening brief in this court, defendant asked us to decide whether his sixth amendment right to counsel had attached at the time of the lineup, a question of constitutional magnitude. If we were to find that defendant's sixth amendment right to counsel *had* attached at the time of the lineup, only then would we have to address whether defense counsel's absence from the viewing room violated defendant's constitutional right. Even *if* we were to answer both questions in the affirmative, we would still have to determine whether defendant was due any relief.

¶ 131    Defendant would have us reach his constitutional contentions via the closely-balanced-evidence prong of plain-error review; he has chosen to forgo an ineffective assistance of counsel argument that would have required him to address trial counsel's articulated strategic decisions, including what the State characterizes as an "affirmative waiver of the admissibility of the lineup identifications." In that regard, the State further observes:

> "A complete record has not been developed because defense counsel chose to attack the weight of the identifications by asking limited questions that established only that counsel did not hear or see the witnesses at the time that they identified defendant, and that the Chicago police department had a policy of not permitting non-police personnel to be in the room with the witness viewing the lineup.
>
> * * *
>
> *** [T]he undeveloped record in this case is utterly silent as to whether defense counsel actually asked to be in the room at the time of the identification, asked to be in a position where he could hear or see the witnesses when they identified defendant, or whether he asked, or was permitted, to interview them immediately afterwards or before they made their identifications. Thus, the evidence does not support the conclusion that defense counsel was 'prohibited' from doing anything[.]"[4]

Clearly, trial counsel recognized that the admissibility of the lineup identification *could* have been challenged–whether or not successfully–yet he chose not to do so–either by a pretrial motion to suppress or via posttrial motion–stating, on the record, his reasons for not doing so. The omission was not inadvertent; it was professedly tactical.

¶ 132    Given the circumstances, one might well argue–as the State implicitly does–that trial

---

[4]As the State observes, through questioning at trial, defense counsel deftly established that he likely *would* have been excluded from the witness viewing room had he requested to be present with the witnesses; however, there is no actual evidence of record that he sought to be present and was *denied* access, nor are other relevant circumstances leading up to and surrounding the lineup fully developed in the record.

counsel's "preferred, well-articulated strategy should not have been deemed 'clear error' sufficient to warrant plain error review," and that defendant should have to pursue his constitutional challenges by means of an ineffective assistance of counsel argument within the framework of *Strickland v. Washington*, 466 U.S. 668 (1984), showing both that counsel's performance was deficient and that prejudice resulted from that deficiency. See *People v. Bailey*, 232 Ill. 2d 285, 289 (2009). While such a question might warrant discussion under different circumstances, there is no need to address it here, where the outcome for this defendant would be the same under either plain-error review or an ineffective assistance analysis.

¶ 133 Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.*, that the verdict "may have resulted from the error and not the evidence" properly adduced at trial (see *People v. Herron*, 215 Ill. 2d 167, 178 (2005) (plain error)); or that there was a "reasonable probability" of a different result had the evidence in question been excluded (see *Strickland*, 466 U.S. at 694).

¶ 134 It is clear in this case, having reviewed the record, that defendant cannot show prejudice. There is no reason to go further for purposes of either an ineffective assistance analysis or one founded upon the closely balanced prong of plain error. Both analyses are evidence-dependent and result-oriented. Even if we were to assume, *arguendo*, there was error in the admission of evidence concerning the lineup, the evidence against defendant is such that he cannot show prejudice for purposes of either analysis. See generally *People v. Davis*, 233 Ill. 2d 244, 273-75 (2009) ("assuming, *arguendo*," there was error, defendant could not establish prejudice for purposes of plain-error review); *People v. Sims*, 192 Ill. 2d 592, 628 (2000) ("[a]ssuming, without deciding," there was error, this court found "no plain error" because there was "no reasonable probability that the jury would have acquitted the defendant"); *People v. Keene*, 169 Ill. 2d 1, 16-19 (1995) (concluding that "no basis exists" to reach defendant's claim of plain error because, "[a]ssuming that prior consistent statements in fact were used improperly to bolster [the witness's] credibility *** the claim does not implicate a substantial right"). Although federal plain-error review is distinct from our alternative two-prong test–the federal approach requiring four elements for relief, *i.e.*, (1) an error or defect not affirmatively waived; (2) a clear obvious error; (3) one that affects substantial rights; and (4) one that seriously affects the fairness, integrity or public reputation of judicial proceedings–we find guidance in the federal court's analysis to the extent that when a party has failed to establish any of the other required elements, the court need not consider whether there was error. See *Nguyen v. United States*, 539 U.S. 69, 89 (2003) (Rehnquist, C.J., dissenting, joined by Scalia, Ginsburg, and Breyer, JJ.) ("Assuming, *arguendo*, that petitioners could satisfy the first three elements of the plain-error inquiry, [citations] their constitutional claim fails for the same reason as does their statutory claim: Petitioners have not shown that the claimed error seriously affected the fairness, integrity, or public reputation of judicial proceedings."); *United States v. Cotton*, 535 U.S. 625, 632-33 (2002) (declining to decide the third federal plain-error prong because the claim did not satisfy the fourth

prong); *Johnson v. United States*, 520 U.S. 461, 469 (1997) (same); *United States v. McBride*, 633 F.3d 1229, 1233 (10th Cir. 2011) (acknowledging that a defendant "is not entitled to relief if he fails to establish one or more of the four elements of plain error" and finding, "[w]ith respect to the first alleged procedural error, Defendant fails on the third prong"); *United States v. Rivera-Rodríguez*, 617 F.3d 581, 600-01 (1st Cir. 2010) ("[W]e assume, *arguendo*, that the Appellant's claim satisfies the first and second prongs of the Supreme Court's articulation of the plain-error standard. However, because we do not find that Appellants' claim satisfies the third prong, we need not resolve the fourth prong, and Appellant's claim fails."); *United States v. Vargas*, 580 F.3d 274, 279 (5th Cir. 2009) (even if, *arguendo*, it was obvious that the prosecutor's remarks were improper, defendant failed to establish the third prong of plain-error review); *United States v. Garza*, 566 F.3d 1194, 1201 (10th Cir. 2009) ("[W]e need not resolve whether the challenged testimony was error or whether that error was plain, because Mr. Garza cannot satisfy the fourth element of plain-error review ***."); *United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (assuming, "*arguendo*," there was error, defendant could not show prejudice for purposes of plain-error review); *United States v. Smith*, 419 F.3d 521, 530 (6th Cir. 2005) (rejecting claim, because it did not satisfy the third plain-error prong, without determining whether an error occurred). Accordingly, we need not resolve whether there was error here because, under a closely balanced analysis, defendant cannot establish prejudice.

¶ 135    Evidence of the lineup identification quite simply did not tip the scales against the defendant. We believe our exhaustive recitation of the evidence in this case demonstrates just how heavily the evidentiary balance weighed in the State's favor, and reveals the minimal significance the trial court accorded the lineup identification. The starting point for an overview of the evidence implicating defendant has to be the testimony of Sherry Collier. Unlike some of the other witnesses who had ties to the neighborhood where the shooting took place–and were subject to internal influences–Collier had none: she had only lived in the neighborhood two or three days at the time of the shooting. She knew no one; she had no arguable motive to identify defendant as Aramein Brown's killer; she had the best opportunity to view the shooter; she was not impeached; and she identified defendant as the murderer via photo array *before* the lineup that is the focus of defendant's constitutional claims.

¶ 136    Defendant's only viable basis for challenging Collier's identification is that she simply misidentified him as the shooter–and she did not initially volunteer comments about his distinctive facial characteristics. It would truly be an incredible sequence of coincidences that Martina Brewer would, immediately after the shooting, falsely identify the very person that Sherry Collier mistook for the killer; that Keith Slaughter would, without reservation, initially identify defendant as the shooter; and that Shawn Davis would identify defendant as the man running from the gas station seconds after the shooting. Four unrelated individuals initially identified defendant as the person present, or running from, the gas station the night of the shooting. Obviously, those identifications were not mere coincidence.

¶ 137    We would be remiss in our evaluation of the evidence if we did not acknowledge the overriding impact that fear appears to have had on the people who testified in this case. Martina Brewer openly expressed her fear while this case was pending and she was

recognized as a witness *for* the State and *against* the defendant. Her recantation appears to have assuaged her fear. Samantha Davis, who still lived in the neighborhood and did not want to be involved–but who *was* involved at the instance of the defense–expressed fear for her safety and that of her brother, who was obviously in fear for *his* safety after testifying for the State. Samantha Davis, after being placed essentially toe-to-toe with defendant just prior to her testimony, testified that defendant was *not* the man she saw running the night of the shooting; this, after she had previously told the police she would not be able to identify anyone. Then there was Keith Slaughter, whose positive identification of defendant became less than positive when he sat on the witness stand facing defendant; and Slaughter's friend, Brian Williams, who, like Samantha Davis, did not want to be involved, but who *was* involved when Slaughter provided the information used to locate and contact Williams.

¶ 138    In addition to these witnesses, there were defendant's "friends," Anna Mae Handy and Tonya Evans–respectively the mother and sister of defendant's "cordial friend," Anastasia Smith–who apparently offered to be alibi witnesses for defendant before they even knew what time the murder had been committed, and who passed on the opportunity to offer exculpatory evidence prior to the time of trial. There was Akim Akbar–the man who set up the time and place for the drug transaction during which an armed assailant just happened to be present, and just happened to shoot the victim. Akbar, the drug dealer with a felony record, testified that defendant was not the murderer. And, of course, there is defendant's testimony. Although he acknowledged a falling out with the Browns over Ajani Brown's wearing of a wire for the government, he denied that he had anything to do with Aramein Brown's death. He knew that the police were looking for him in connection with Brown's death, and he acknowledged that he told them he would come in and speak with them, but failed to show up. Defendant, who, in other cases, readily offered exculpatory information to gain dismissal of pending charges against him, did not choose to do so in this case. Instead, he chose to travel–most would reasonably infer flee–to East St. Louis.

¶ 139    Evaluating the totality of the evidence in this case–as a practical matter a preliminary step any court of review would take where a defendant claims the evidence was so closely balanced that review of an error is necessary–we disagree with the appellate court's threshold finding that the evidence in this case was closely balanced. It was that preliminary finding that served as the justification for further plain-error analysis. A qualitative–as opposed to strictly quantitative–commonsense assessment of the evidence demonstrates that the evidence was not closely balanced, as our evidentiary recitation reveals.

¶ 140    Moreover, the trial court's comments of record indicate that the lineup did not figure prominently in the court's finding of guilt. In the isolated instances when the lineup is mentioned, those references are invariably conjoined with references to the photo identifications which preceded the lineup–photo identifications that are not implicated in defendant's constitutional contentions. Instead, the court's remarks focus on the *credibility* of witnesses, as its concluding comments make clear. After first commenting on its prior determinations regarding the credibility of State witnesses, at the close of the State's case, and remarking, negatively, on the credibility of defendant's alibi witnesses, the court concluded with these remarks:

   "The court has examined the possibilities for the reluctance of some of the witnesses

and the testimony of the witnesses and any possible motives, bias or interests they may have. The court finds based on the credibility of the witnesses who I have observed, their demeanor, their manner while testifying and the reasonableness of all of them that the defendant has been proven guilty beyond a reasonable doubt ***."

¶ 141    The transcript of *trial* proceedings in this case is more than sufficient to reveal nuances of motive, bias, and interest in witnesses' testimony, from which we, as a court of review, can adequately evaluate the weight given the lineup identification and its impact on in-court identifications of defendant. The impact is *de minimis.*

¶ 142    With respect to the in-court identification of those witnesses who had previously viewed the lineup–and had before that identified defendant via photo arrays–there was clearly an independent basis for their identifications of defendant. In *United States v. Wade*, 388 U.S. 218 (1967), the Supreme Court outlined critical factors for a court to consider in deciding whether there exists an independent basis for identification, including "the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any prelineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification." *Wade*, 388 U.S. at 241. Both Collier and Slaughter–assuming for present purposes that Slaughter even made an in-court identification–observed the criminal act, which took place in a well-lit area, but Collier in particular had an excellent opportunity to view the defendant at close range before the shooting started. The initial descriptions given by them were of necessity sketchy, as the police were quickly trying to gather information immediately after the shooting; however, any discrepancies were not what we would consider significant. Neither witness previously identified someone other than defendant, or failed to identify him as the offender when given the opportunity. Significantly, both identified defendant, before the lineup, by viewing photo arrays. Finally, only a little over a month elapsed from the time of the shooting to the lineup. Under these circumstances, having examined the record of trial proceedings, we are convinced that no in-court identifications were influenced by the lineup. *Cf. United States v. West*, 628 F.3d 425, 430 (7th Cir. 2010) (record insufficient to make *Wade* findings).

¶ 143    However, the circumstances surrounding the conduct of the lineup, and those leading up to it, are less clearly developed. Because defense counsel never moved to suppress the lineup identifications on grounds defendant now asserts, there was no suppression hearing; hence the State may not have adduced all available evidence bearing upon defendant's current constitutional contentions. Thus, we do not have a record equitably compiled for the purpose of addressing the attachment issue defendant actually raised in his petition for leave to appeal and in his opening brief, nor for the issue we *might* have to address in the event we were to find the right to counsel had attached at the time of the lineup. Neither side presented arguments applicable thereto. In sum, we are not confident that all of the evidence that could have been brought to bear on these issues was in fact adduced. The question then is whether we should pass upon defendant's constitutional claims of error where the state of the record is suspect for that purpose and a finding one way or the other on the claimed errors would not affect the outcome of this case in any event. We think the answer is clearly no.

¶ 144    We acknowledge that, as a matter of convention, this court has typically undertaken plain-error review by first determining whether error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189-90 (2010); *People v. Walker*, 232 Ill. 2d 113, 124 (2009). In this respect, our sequential analysis has been more rigid than that of our federal counterparts. This court has also cautioned, however, that courts of review should not ordinarily consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided (*People v. Campa*, 217 Ill. 2d 243, 270 (2005); *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990)), and that " '[a] court will consider a constitutional question only where essential to the disposition of a case, *i.e.*, where the case cannot be determined on other grounds.' " *Beahringer v. Page*, 204 Ill. 2d 363, 370 (2003) (quoting *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 396 (1994)); *Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 396 (1999) (same); accord *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 329 (1995) (constitutional challenge to special duty doctrine not addressed because, *inter alia*, it was unnecessary to our disposition); *People v. Dixon*, 28 Ill. 2d 122, 125 (1963); see also *Harmon v. Brucker*, 355 U.S. 579, 581 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioner's non-constitutional claim ***."). This principle has been invoked and applied "even though the court acquires jurisdiction of the case because a constitutional question is involved." (Internal quotation marks omitted.) *People v. Waid*, 221 Ill. 2d 464, 473 (2006). In considering whether we should address the alleged errors in *this* case, and adhere to our "conventional" approach to plain-error review in cases where the *only* basis for a claim of plain error is that the evidence is closely balanced, we have found guidance in the previously cited federal authorities, and in the United States Supreme Court's recent decision in *Pearson v. Callahan*, 555 U.S. 223 (2009).

¶ 145    In *Pearson*, the Court addressed the analytical framework to be utilized in cases raising an issue of qualified immunity, which protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Specifically, the Court considered whether to continue mandating the rigid procedure established in *Saucier v. Katz*, 533 U.S. 194 (2001). That procedure required a two-step sequence for resolving government officials' qualified immunity claims. First, a court was required to decide whether the facts that a plaintiff had alleged or shown made out a constitutional violation. Second, if the plaintiff had satisfied the first step, the court would decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Saucier required* that the analysis of a qualified immunity issue be undertaken in that specified sequence. The *Pearson* Court noted that commentators and lower courts had criticized, or had been less than enthusiastic about, the *Saucier* "rigid order of battle" on grounds that it resulted in "a puzzling misadventure in constitutional dictum" (quoting from Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)), and that its implementation "violated *** principles of judicial restraint" which "caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case" (quoting from *Higazy v. Templeton*, 505 F.3d 161, 179 n.19 (2d Cir. 2007)). *Pearson*, 555 U.S. at 234. In *Pearson*, the Court decided that the sequential, analytical requirements

announced in *Saucier* should be relaxed, stating that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. In reaching that result, the Court noted that:

> "[T]he rigid *Saucier* procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Pearson*, 555 U.S. at 236.

Further, the Court observed that "[u]nnecessary litigation of constitutional issues also wastes the parties' resources" (*Pearson*, 555 U.S. at 237) and "departs from the general rule of constitutional avoidance," running "counter to the 'older, wiser judicial counsel "not to pass on questions of constitutionality ... unless such adjudication is unavoidable." ' " *Pearson*, 555 U.S. at 241 (quoting in part from *Scott v. Harris*, 550 U.S. 372, 388 (2007) (Breyer, J., concurring), quoting from *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)).

¶ 146      Finally, the Court pointed out, in "other analogous contexts," it had declined to mandate the order of decision that the lower courts were required to follow, citing as an example the analytical option that courts have in applying the two-prong requisites of *Strickland v. Washington*, 466 U.S. 668 (1984): " '[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if defendant makes an insufficient showing on one.' " *Pearson*, 555 U.S. at 241 (quoting from *Strickland*, 466 U.S. at 697).

¶ 147      Given comments the justices of the Supreme Court have made post-*Pearson*, it is clear that they did not intend for the principles of judicial restraint expressed therein to apply *only* to lower courts; they intend to continue abiding by those time-honored dictates themselves. For example, in *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. __, __, 129 S. Ct. 2504, 2508 (2009), the Supreme Court noted that the constitutional question it had been urged to decide had "attracted ardent briefs from dozens of interested parties"; however, the Court concluded: "[T]he importance of the question does not justify our rushing to decide it. Quite the contrary: Our usual practice is to avoid the unnecessary resolution of constitutional questions." In Chief Justice Roberts' concurring opinion in *Citizens United v. Federal Election Comm'n*, 558 U.S. __, 130 S. Ct. 876 (2010), he observed that the majority and the dissent were united in expressing allegiance to the principles that the Court would "refrain from addressing constitutional questions except when necessary to rule on particular claims before us" and "never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (Internal quotation marks omitted.) *Citizens United*, 558 U.S. at __, 130 S. Ct. at 918 (Roberts, C.J., concurring, joined by Alito, J.) (in part quoting *United States v. Raines*, 362 U.S. 17, 21 (1960), quoting *Liverpool, New York & Philadelphia Steamship Co. v. Commissioners of Emigration*, 113 U.S. 33, 39 (1885)). Similarly, in *Ashcroft v. al-Kidd*, 563 U.S. __, 131 S. Ct. 2074 (2011), Justice Sotomayor concurred with the result reached by the majority, but concluded the majority opinion "unnecessarily resolve[s] [a] difficult and novel questio[n] of constitutional ... interpretation that will have no effect on the outcome of the

case." (Internal quotation marks omitted.) *Ashcroft*, 563 U.S. at __, 131 S. Ct. at 2089-90 (Sotomayor, J., concurring, joined by Ginsburg and Breyer, JJ.) (quoting *Pearson*, 555 U.S. at 237). Thus, while they may not agree on *when* the *Pearson* principles apply, there is no disagreement that they generally control the Court's decisions to reach and address issues.

¶ 148    The various principles cited in *Pearson* in support of the Supreme Court's relaxation of the *Saucier* protocol, and in Supreme Court opinions postdating *Pearson*, would appear to apply with equal force in this situation. We do not, and should not, manufacture reasons to address issues–constitutional or otherwise–where the record has not been fully and fairly developed for that purpose and where resolution of the issues is unnecessary. Certainly, it is a fundamental rule of judicial restraint that a court not reach *constitutional* questions in advance of the necessity of deciding them. See *Holder*, 557 U.S. at __, 129 S. Ct. at 2508; *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 157-58 (1984). Where the only basis proffered for plain-error review is a claim that the evidence is closely balanced, an assessment of the impact of an alleged evidentiary error is readily made after reading the record. When it is clear that the alleged error would not have affected the outcome of the case, a court of review need not engage in the meaningless endeavor of determining whether error occurred. As the Supreme Court observed in *Massaro v. United States*, 538 U.S. 500, 504 (2003), "[t]he procedural-default rule *** is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." In this context, a procedure that *requires* Illinois courts of review to examine and address claimed evidentiary errors that could not have affected the outcome runs contrary to the very purpose of the procedural-default rule. In this instance, the circumstances of this case, and the principles of appellate review we have discussed, militate against our review of the constitutional issue defendant would have us address.

¶ 149    Before concluding, we feel compelled to respond to our "dissenting" colleagues, though it may be a mischaracterization to refer to them as such insofar as they do not take issue with the ultimate disposition of this case. Rather, they insist that we should discuss the questions raised in defendant's petition for leave to appeal and his opening brief–both limited to the question of the attachment of the sixth amendment right to counsel–before we deny defendant relief. The dissenters imply that this discussion is necessary so that the lower courts will have the benefit of our wisdom. In essence, the dissenters insist that we took this case to address the question of attachment and we knew what we were getting into when we took the case.

¶ 150    That is simply not so. We do not see the record when we grant or deny a petition for leave to appeal. Surely the dissenters are aware of instances when something "we uncovered in our review of the record" serves as the justification for not reaching an issue we intended to address when we allowed a petition for leave to appeal. See *People v. Smith*, 228 Ill. 2d 95, 103-06 (2008) (this court disposed of the case on the basis of a mistake or defect in the notice of appeal which the parties did not address and the appellate court apparently did not find significant). While we can normally rely upon an appellate panel's assessment that the evidence in a case is closely balanced, that assessment was not reliable in this instance. Whether that was because the appellate court put too much emphasis on the *quantity* of evidence adduced on each side, or whether it too was simply desirous of reaching the issues,

is not entirely clear. With respect to the latter possibility, it *does* seem that logic might dictate determining first whether the sixth amendment right attached before finding the lineup procedure violated that right. Had the appellate court proceeded in the converse manner, given its ultimate holding on the attachment issue, there would have been no need to address the procedure by which the lineup was conducted.

¶ 151    In any event, there is also the suggestion by the dissenters that courts below are in need of guidance on these issues and this is the case in which to give it. We note, however, that the attachment issue does not appear to be one that arises frequently, nor is it one over which there are conflicting appellate opinions. Aside from that, we have the additional record deficiencies already mentioned, which resulted from defense counsel's fence-riding strategy: neither raising the issues in earnest, nor contenting himself to leave them alone. With respect to the attachment issue, the appellate court commented on the consequences of counsel's attempt to have it both ways, without apparently recognizing the cause: "The State has not addressed the issue of defendant's prolonged detention nor has it given any explanation as to why eight days is not considered an 'unnecessary delay' other than to state that defendant produced no evidence to show that it was not his decision to waive arraignment. *** Defendant does not argue, and the record does not support an argument that the police intentionally delayed presenting him to a judicial officer for the purpose of preventing attachment." 395 Ill. App. 3d at 824. That, it seems to us, *is* what defendant is now arguing. With respect to the secondary issue, concerning the propriety of the lineup procedure, we note that Detective Fassl testified he had conducted approximately 50 lineups in the same manner, and that the procedure employed in this instance represents the established policy of the Chicago police department. To our knowledge, this was the first such case raising this specific issue, suggesting that the procedure is not seen as problematic by the criminal defense bar. If it is a concern, we anticipate the issue will soon resurface via a case in which pertinent evidence is adduced and the issue is properly argued and preserved.

¶ 152    We next respond to the dissenters' contention–in service of their insistence that we address the issues raised in defendant's petition for leave to appeal–that *People v. Allen*, 222 Ill. 2d 340 (2006), is indistinguishable from this case. Initially, in response to their charge of inconsistency, we note that the *dissenters*' view of when this court should or should not reach an issue raised in a petition for leave to appeal seems to be variable and idiosyncratic. See *People v. Manning*, 241 Ill. 2d 319, 350 n.1 (2011) (Freeman, J., dissenting, joined by Burke, J.) (arguing that the majority should not have addressed the continued viability of this court's holding in *People v. Metcalfe*, 202 Ill. 2d 544 (2002)–a principal issue raised in defendant's petition for leave to appeal–because it was not *necessary* to do so); see generally *Keene*, 169 Ill. 2d at 16-19 (holding there was "no basis" upon which to reach the claimed error, pursuant to plain-error review, because, "[a]ssuming that prior consistent statements in fact were used improperly to bolster [the witness's] credibility," the claim did not implicate a substantial right).

¶ 153    In any event, we believe there are distinctions to be made between this case and *Allen*. For one thing, as the *Allen* dissenters acknowledged at the outset, "[t]his court ha[d] never addressed the propriety of using [a stun belt as a] restraint at a criminal trial." *Allen*, 222 Ill. 2d at 361 (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.). That would be

one reason to address, in *Allen*, whether error occurred at all. This is certainly not the first time this court has been called upon to address whether the sixth amendment right to counsel had attached at the time of a lineup. See *People v. Ballard*, 206 Ill. 2d 151, 171-75 (2002); *People v. Garrett*, 179 Ill. 2d 239, 246-51 (1997). Second, we believe the pertinent considerations weigh more heavily in favor of addressing the claimed error itself, in the context of plain-error review, when the argument is that the claimed error is one that qualifies for review under the *second* prong of our plain-error analysis. The question there is whether the claimed error is the type of error that " 'erode[s] the integrity of the judicial process and undermine[s] the fairness of the defendant's trial.' " *Allen*, 222 Ill. 2d at 364 (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.) (quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). In such cases, there may be a procedural synchronicity that militates in favor of addressing both the claimed error and its trial context. In this case, however, the only basis advanced for plain-error review is a contention that the first prong of plain error applies, that the evidence is closely balanced. It is not. Irrespective of whether the right to counsel had attached, or whether the lineup procedure violated that right, the result would not have been otherwise because evidence of the lineup did not make a difference in the outcome. Third, although we have already commented on the state of the record, we have, perhaps, not sufficiently emphasized our concerns over the way in which record deficiencies came about. Unlike *Allen*, a case that fits comfortably within the plain-error mold, a case in which trial counsel seems to have been less than conversant with the applicable law, defense counsel in this case was obviously very astute and knowledgeable. This is not an instance in which the issues now argued were forfeited because of trial counsel's ignorance. Defendant's trial attorney *chose* to proceed in this manner. His questioning touched upon the issues now in controversy, but lightly, and in a manner that would not likely evoke responsive questioning by the State on those points, particularly in light of the fact that defense counsel had not filed anything raising either issue. Now, on appeal, appellate counsel would have us reach defendant's issues via plain-error review, on a record which we deem inequitably compiled for this purpose–and *consciously* so–without so much as mentioning trial counsel's deliberate actions and omissions bearing upon the issues. This seems to us a consideration in deciding whether to address, as plain error, the issues defendant raises in this appeal. This consideration was not present in *Allen.* Finally, we comment again upon the sequence of determinations made by the appellate court. It was only because of the appellate court's first determination, an assessment that the evidence was closely balanced, that the appellate court addressed *either* of the issues now in controversy. It was only because the appellate court decided to address the lineup procedure–which it found violative of defendant's right to counsel–before it even considered whether a right to counsel existed, that the propriety of the lineup procedure was even reached. In view of this sequence of events, we believe it appropriate to caution courts of review–particularly when constitutional issues are involved–that they are not free rangers riding about the legal landscape looking for law to make. Judicial restraint is a principle of review that the justices of the Supreme Court strive to observe. See majority and dissenting opinions in *Camreta v. Greene*, 563 U.S. __, __, __, 131 S. Ct. 2020, 2031, 2040 (2011). Our precedent counsels such adherence as well. We expect appellate panels to do the same.

¶ 154    For the reasons stated, we affirm the judgment of the appellate court, though we find it unnecessarily, and inappropriately, addressed defendant's constitutional contentions, given the circumstances aforementioned. See *People v. McDonough*, 239 Ill. 2d 260, 275 (2010) (this court is not bound by the appellate court's reasoning and may affirm on any basis presented in the record). Consequently, we reject that part of the appellate court's opinion that discussed, and rendered holdings on, the issues of attachment of the right to counsel and the lineup procedure employed in this case.

¶ 155    Affirmed.

¶ 156    JUSTICE BURKE, dissenting:

¶ 157    We granted defendant's petition for leave to appeal in this case in order to address an important issue regarding when the sixth amendment right to counsel attaches. The majority chooses not to address this issue. Because there is no legal reason why it should not be addressed, I dissent.

¶ 158                                    I

¶ 159    In his appeal to the appellate court, defendant argued for the first time that his sixth amendment right to counsel was violated when, pursuant to Chicago police department policy, his attorney was not allowed to be present in the witness room during the in-person lineup conducted for Sherry Collier. According to defendant, the lineup was a critical stage of the criminal proceedings at which counsel was entitled to be present and, because his attorney was not permitted to view or hear Collier identify defendant, he was deprived of the opportunity for meaningful cross-examination at trial regarding the identification. In addition, defendant claimed that the absence of counsel from the witness room gave the State an advantage in presenting testimony that supported the propriety of procedures and events that took place within that room. Defendant acknowledged that his sixth amendment claim had not been raised in the trial court but asked the appellate court to review the claim for plain error.

¶ 160    Addressing defendant's claim for plain error, the appellate court held, as a matter of "first impression in Illinois" (395 Ill. App. 3d 797, 810), that once adversarial criminal proceedings have commenced, a general policy of prohibiting defense attorneys from observing the moment of identification at a lineup violates the accused's sixth amendment right to counsel. The appellate court then went on to hold, however, that adversarial criminal proceedings do not begin, and a defendant's sixth amendment right to counsel does not attach, until the defendant has been presented before a judicial officer. Because the defendant in this case did not appear before a judge until after the lineup had been conducted, the appellate court concluded that defendant's sixth amendment rights had not been violated. *Id.* at 824.

¶ 161    Defendant thereafter filed a petition for leave to appeal in this court in which the sole contention presented was that the appellate court erred in holding that defendant's right to counsel had not attached. The petition for leave to appeal maintained that review by this

court was warranted because the appellate court's holding was contrary to the United States Supreme Court's decision in *Rothgery v. Gillespie County*, 554 U.S. 191 (2008), and in addition, because establishing the onset of the right to counsel is an issue that touches "every criminal prosecution," it was "paramount that Illinois's court of last resort be heard." Recognizing the importance of the issue presented, we granted defendant's petition for leave to appeal.

¶ 162    In this court, defendant contends that the appellate court erred in holding that his sixth amendment rights had not attached at the time of the lineup. The State disputes this contention, maintaining that the appellate court correctly held that *Rothgery* did not "obviate presentment before a judicial officer as a trigger to attachment of the sixth amendment right to counsel" (395 Ill. App. 3d at 823). The State also contends that, even if defendant's right to counsel had attached at the time of the lineup, the appellate court erred in holding that the policy of excluding defense attorneys from the witness room violated that right. As in the appellate court, defendant acknowledges that his sixth amendment claim was not raised in the trial court and asks us to review the matter for plain error.

¶ 163                                                    II

¶ 164    As a matter of convention, our court typically undertakes plain-error analysis by first determining whether error occurred at all. "If error is found, the court then proceeds to consider whether either of the two prongs of the plain-error doctrine have been satisfied." *People v. Sargent*, 239 Ill. 2d 166, 189-90 (2010); see also, *e.g.*, *In re Jonathon C.B.*, No. 107750, slip op. at 21 (June 30, 2011) ("in addressing a plain-error argument, this court first considers whether error occurred at all"); *People v. Walker*, 232 Ill. 2d 113, 124 (2009); *People v. Hudson*, 228 Ill. 2d 181, 191 (2008); *People v. Urdiales*, 225 Ill. 2d 354, 415 (2007); *People v. Durr*, 215 Ill. 2d 283, 299 (2005).

¶ 165    In this case, the majority departs from our customary plain-error analysis by skipping over the question of whether error occurred. The majority does not decide the issue raised in defendant's petition for leave to appeal, *i.e.*, whether defendant's sixth amendment right to counsel attached at the time of defendant's lineup. Instead, the majority assumes, *arguendo*, that defendant's right to counsel had attached and that the police department's policy of excluding attorneys from the witness room violated that right. The majority then concludes, however, that because the evidence in this case is not closely balanced, defendant was not prejudiced by the constitutional violation. *Supra* ¶ 134. Thus, because defendant was not prejudiced by the assumed error, the majority holds that defendant has not established plain error.

¶ 166    The majority's primary justification for departing from our customary plain-error analysis is that, by declining to address whether error occurred in this case, it is avoiding a "meaningless endeavor," thereby conserving judicial resources and adhering to the purpose of the procedural default rule. The majority explains:

> "Where the only basis proffered for plain-error review is a claim that the evidence is closely balanced, an assessment of the impact of an alleged evidentiary error is readily made after reading the record. When it is clear that the alleged error would

not have affected the outcome of the case, a court of review need not engage in the meaningless endeavor of determining whether error occurred. As the Supreme Court observed in *Massaro v. United States*, 538 U.S. 500, 504 (2003), '[t]he procedural-default rule *** is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments.' In this context, a procedure that *requires* Illinois courts of review to examine and address claimed evidentiary errors that could not have affected the outcome runs contrary to the very purpose of the procedural-default rule." (Emphasis in original.) *Supra* ¶ 148.

¶ 167    I agree with the majority that Illinois courts of review do not always have to address whether error occurred when conducting plain-error analysis. Although it is customary to decide whether there was error, the reviewing court always has the discretion to resolve the forfeited claim on the basis that the defendant suffered no prejudice. In this case, however, the majority's assertion that we must forgo deciding the issue raised in defendant's petition for leave to appeal because of a need to conserve judicial resources and adhere to the purpose of the procedural default rule is not persuasive.

¶ 168    The present case is a discretionary appeal brought under Supreme Court Rule 315 (Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010)). The only issue raised in defendant's petition for leave to appeal was whether the appellate court erred in holding that defendant's right to counsel had not attached at the time of the lineup. Moreover, it was evident from defendant's petition and the appellate court opinion that this issue had been forfeited. Because the attachment issue was the only issue raised in defendant's petition for leave to appeal, our granting of the petition was necessarily a determination that the attachment issue, though forfeited, is of substantial public importance and, as such, merits the expenditure of this court's time and effort to review it. The majority has not retreated from that determination. That is, the majority has not concluded that, upon further consideration, discretionary review of the attachment issue is inappropriate and this appeal was improvidently granted. Accordingly, the majority's decision not to address the attachment issue and to resolve defendant's claim on prejudice alone reduces, ultimately, to this: The majority continues to believe that defendant's petition for leave to appeal was properly granted because it raises an issue of public importance that merits the expenditure of this court's time and effort. However, the majority will not address that issue because it would take too much time and effort. This is not a reasonable position.

¶ 169    Courts of review have discretion regarding how to proceed when conducting plain-error review. We exercised that discretion when we granted defendant's petition for leave to appeal. It makes no sense, in my view, to grant a petition for leave to appeal in order to address a forfeited issue and then to conclude that we cannot address that issue because it is forfeited. To be consistent with our decision granting leave to appeal, and in accordance with our customary plain-error analysis, we should address the attachment issue.

¶ 170    The majority contends, however, that there is more to its decision not to reach the attachment issue than simply a need to adhere to principles of procedural default. According to the majority, the attachment issue may not be addressed because "it is a fundamental rule of judicial restraint that a court not reach *constitutional* questions in advance of the necessity of deciding them." (Emphasis in original.) *Supra* ¶ 148. But this rule, which has been

-44-

referred to as the "last resort rule" (see Lisa A. Kloppenberg, *Avoiding Constitutional Questions*, 35 B.C. L. Rev. 1003 (1994)), is not an absolute or jurisdictional bar to adjudication. It is, instead, a self-imposed judicial restraint, or "prudential rule" (*Zobrest v. Catalina Foothills School District*, 509 U.S. 1, 7 (1993)), invoked at the "sound discretion" of the court "in light of the circumstances in the particular case at hand" (*Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). See also, *e.g.*, Michael L. Wells, *The "Order-of-Battle" in Constitutional Litigation*, 60 S.M.U. L. Rev. 1539, 1552 (2007) (the last resort rule "is best characterized as a flexible norm, not an absolute requirement").

¶ 171      Because it is a discretionary doctrine, the last resort rule logically cannot preclude this court from addressing the very issue that prompted us to exercise our discretion and accept this case for review in the first place. Indeed, by invoking the rule here, the majority adopts an untenable position: We allowed defendant's petition for leave to appeal because it raised an important constitutional issue. Yet, according to the majority, we cannot address that issue because it is constitutional. Again, this is not a reasonable position.

¶ 172      Further, previous decisions from this court have established that the last resort rule does not bar us from deciding whether error occurred in this case. For example, in *People v. Allen*, 222 Ill. 2d 340 (2006), the defendant was required to wear an electronic restraining device, or stun belt, under his clothes at trial. In the appellate court, the defendant argued that the trial court erred in requiring him to wear the device without first holding a hearing pursuant to *People v. Boose*, 66 Ill. 2d 261 (1977), and that the failure amounted to plain error. The appellate court agreed and reversed his conviction.

¶ 173      The State thereafter filed a petition for leave to appeal in this court, raising the appellate court's holding with respect to the stun belt as its sole claim of error. In its petition, the State maintained that review was warranted because a stun belt did not implicate any of the concerns presented by visible physical restraints such as handcuffs and shackles and, therefore, the appellate court erred in holding that the stun belt fell within the requirements of *Boose*. The State also contended that, even if a *Boose* hearing was required, and the trial court erred in not holding one, the defendant was not prejudiced by the error.

¶ 174      Reviewing the defendant's claim for plain error, this court first held that *Boose* applied to electronic restraints and that "the trial court's failure to follow the procedures set forth in *Boose* before ordering that defendant continue to wear an electronic stun belt during his trial constitute[d] a due process violation." *Allen*, 222 Ill. 2d at 345-49. The court then went on, however, to hold that the error did not prevent defendant "from obtaining a fair trial" and, accordingly, he could not establish plain error. *Id*. at 353-54. Thus, in *Allen*, this court decided a constitutional question–whether the defendant's due process rights were violated by the failure to hold a *Boose* hearing–even though it could have been avoided and the case resolved solely on the basis that the defendant failed to demonstrate prejudice.

¶ 175      The present case is, in relevant part, indistinguishable from *Allen*. As in that case, the substantive issue in this case arises within the framework of plain error, where we customarily first consider whether error occurred at all. And, just as the last resort rule played no role in *Allen*, it should play no role here. See also, *e.g.*, *In re Jonathon C.B.*, slip op. at 19-23 (addressing whether a constitutional error occurred within the context of plain error).

¶ 176    The majority does not dispute that we knew, when we granted defendant's petition for leave to appeal, that the only issue presented was a forfeited, constitutional issue. However, the majority points out that we did not know the state of the record. Now, having examined the record, the majority concludes that review of the attachment issue is inappropriate because the record was not "equitably compiled for the purpose" of addressing that issue. *Supra* ¶ 143. According to the majority, "[n]either side presented arguments applicable" to the attachment issue in the trial court and thus, "the state of the record is suspect for that purpose." *Supra* ¶ 143. I cannot agree with this reasoning. The definition of a forfeited issue is one that was not argued in the trial court. If the fact that no arguments were made in the trial court on the attachment issue was sufficient to preclude our discussing whether error occurred in this case, then the plain-error doctrine would cease to exist.

¶ 177    The majority further states that they are "not confident that all of the evidence that could have been brought to bear on [the attachment issue] was in fact adduced." *Supra* ¶ 143. However, the majority never explains why further evidence might be required or what that evidence might be. Defendant raised only one issue in his petition for leave to appeal: whether "presentment before a judicial officer [is] a trigger to attachment of the sixth amendment right to counsel" (395 Ill. App. 3d at 823). This is an issue of law that does not require further evidentiary development to be addressed.

¶ 178    Finally, even if I were to agree with the majority that we cannot address the attachment issue, I still could not join the majority because I do not agree with their treatment of the appellate court's sixth amendment holdings. After explaining at length why they cannot reach the merits of any of the sixth amendment issues addressed by the appellate court, the majority reverses course at the conclusion of their opinion and states that they "reject that part of the appellate court's opinion that discussed, and rendered holdings on, the issues of attachment of the right to counsel and the lineup procedure employed in this case." *Supra* ¶ 154. I do not understand how the majority can reject holdings they have expressly declined to review. If the majority believes, as it states, that the appellate court "unnecessarily, and inappropriately, addressed defendant's constitutional contentions" (*supra* ¶ 154), then the majority should vacate those portions of the appellate court's opinion. This would be the logically appropriate disposition, given the majority's determination that none of the sixth amendment issues should ever have been reached by the appellate court. The majority's reluctance to employ the appropriate legal terminology is perplexing and will no doubt lead to confusion on the part of those who attempt to follow this decision.

¶ 179                                                        III

¶ 180    I express no opinion on how the attachment issue should be resolved. My point is that, having already determined that the attachment issue is important enough to address when we granted defendant's petition for leave to appeal, we should do so. It is not that I believe the lower courts need "the benefit of our wisdom" (*supra* ¶ 149), as the majority states. It is simply a matter of being consistent with our decision granting leave to appeal.

¶ 181    We should not abandon logic out of a misplaced concern for judicial restraint. Instead of worrying about whether we have attained "procedural synchronicity" (*supra* ¶ 153), or

-46-

scolding our appellate justices for being "free rangers riding about the legal landscape" (*supra* ¶ 153), I would address the issue that we took this case to address. Because the majority does not do so, I dissent.

¶ 182    JUSTICE FREEMAN joins in this dissent.